Entered: January 29th, 2021
Signed: January 29th, 2021



**DAVID E. RICE**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| CHRISTOPHER DAVIS, | ) | Case No. 16-15555-DER |
| and TERESA DAVIS, | ) | (Chapter 13) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| TERESA DAVIS, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Adversary Pro. No. 17-00280 |
| | ) | |
| PNC BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### <u>MEMORANDUM OPINION</u>

The United States Court of Appeals for the Fourth Circuit recently opined:

> Perhaps not surprisingly, given the large stakes for financially stressed
> homeowners, and in light of widespread media reports of bureaucratic bungling
> (and worse) on the part of lenders, mortgage servicers, and their myriad agents,
> [the Home Affordable Modification Program ("HAMP")] has given rise to a
> large number of civil claims by mortgagors against financial industry firms.

*Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 774 (4th Cir. 2013). This is such a case. The HAMP modification agreement in dispute here was signed by the plaintiffs, Teresa Davis and Christopher Davis (collectively, the "Davises"), and recorded in the land records, but was never signed by the defendant, PNC Bank, N.A. ("PNC").[1] The Davises argue that PNC is nevertheless bound by the agreement and that they are entitled to relief against PNC for its breach. PNC counters that no binding agreement was ever created because PNC exercised an allegedly unilateral right to terminate before the Davises satisfied all the conditions precedent—including bankruptcy court approval.

A trial on the merits was conducted on July 29 and 30, 2019. At trial, three witnesses testified, and the parties introduced ninety-nine exhibits into evidence.[2] After closing argument in October 2019 as well as post-trial briefing, the Court held this matter under advisement. Subsequently, the Covid-19 pandemic intervened and delayed the Court's resolution of this matter. After consideration of all the evidence and due deliberation,[3] the Court will rule in favor of the Davises.

## JURISDICTION

The court has subject matter jurisdiction over this proceeding under 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and Rule 402 of the Local Rules of the United States District Court for the District of Maryland. This is a "core proceeding" under 28 U.S.C. § 157(b).[4] This memorandum

---

[1]  PNC most often acted under the name "PNC Mortgage", which is an unincorporated division of PNC that has no separate legal existence apart from PNC itself. Thus, an action taken by or in the name of PNC Mortgage was an action taken by PNC.

[2]  The documents marked collectively for identification as Plaintiffs' Exhibits 5 and 46 were not admitted into evidence and were not considered by the Court in making the decision reflected in this Memorandum Opinion.

[3]  In addition to reviewing the various pleadings and legal memoranda filed by the parties, the Court has reviewed all the exhibits admitted into evidence and listened to the recording of the testimony at trial and the closing arguments of counsel.

[4]  The Court has considered and rejects PNC's assertion that this adversary proceeding is not a statutory core proceeding under 28 U.S.C. § 157(b). The question of the enforceability of the mortgage modification agreement at issue here is one that must be resolved as part of the claims allowance process. Moreover, PNC asserted as much

opinion constitutes the court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure (made applicable here by Rule 7052 of the Federal Rules of Bankruptcy Procedure).[5]

## FINDINGS OF FACT

After consideration of all the evidence and of the demeanor and credibility of the witnesses, the Court makes the following findings of fact based upon the preponderance of the evidence.

### The Witnesses

Teresa Davis works for Northrop Grumman Corporation ("Northrop Grumman") and has held a high-level security clearance for more than thirty years as a result of her employment at the National Security Agency and other government agencies.  She was the spouse primarily dealing with PNC, and as such has actual first-hand knowledge of the relevant events.  Because of her financial difficulties and bankruptcy cases, she has successfully undergone annual security reviews (including polygraph tests) for the last six years to maintain her security clearance.  The Court finds her to be a credible witness.

Christopher Davis is a correctional officer for the Sheriff's Department of Frederick County, Maryland.  He has been in law enforcement since 2009.  He has actual first-hand knowledge of the events at issue here and the Court finds him to be a credible witness.

---

itself when it filed a motion in this Court asserting that the agreement was part of the loan documents evidencing its alleged secured claim.  Thus, it is clear that the claims made against PNC are matters under § 157(b)(2)(B) concerning the "allowance and disallowance of claims" or under § 157(b)(2)(C) concerning "counterclaims by the estate against persons filing claims against the estate."  To the extent that it is found that the Court lacks authority to enter its order herein as a final order, the court submits this memorandum opinion as proposed findings of fact and conclusions of law in accordance with 28 U.S.C. § 157(c)(1).  *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015); *Executive Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 573 U.S. 25 (2014); *Stern v. Marshall*, 564 U.S. 462 (2011).

[5] To the extent any finding of fact may constitute a conclusion of law, it is adopted as such.  To the extent any conclusion of law may constitute a finding of fact, it is likewise adopted as such.

Dorothy Thomas was the only witness called to testify by PNC.[6]  She has worked for PNC and its predecessor in interest, National City Corporation, since 1992.  She currently works in PNC's default litigation department as a "default litigation specialist senior."  Ms. Thomas was not involved in any of the events or decisions made at issue here.  Meaning, her testimony has no basis in first-hand personal knowledge—it was based solely on her review of PNC's records after the fact and in preparation for trial in this litigation.[7]  The Court does not doubt that she is knowledgeable about PNC's mortgage servicing systems and testified truthfully about her understanding of PNC's records.  Nevertheless, the Court gives little weight to her testimony because (i) Ms. Thomas has no first-hand knowledge, and (ii) PNC offered no witness with actual knowledge to corroborate her testimony or the contents of PNC's records.

## Background

The Davises purchased real property known as 304 Saddleback Trail, Mount Airy, Maryland 21771 (the "Property") on or about August 25, 2005 for $725,585.00,[8]  a few months after getting married.  They own the Property as tenants by the entirety.  The Property is, and at all relevant times was, the primary residence of the Davises and their family.

---

[6]  Ms. Thomas was also called as a witness by the Davises as part of their case in chief.  During the discovery phase of this case, Ms. Thomas was designated to testify on PNC's behalf pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure (made applicable here by Rule 7030 of the Federal Rules of Bankruptcy Procedure).

[7]  Ms. Thomas offered extensive testimony about and interpretation of the cryptic terminology recorded in what PNC refers to as Loss Mitigation Notes [Defendant's Exhibit 22] and Servicing Notes [Defendant's Exhibit 23].  Numerous persons made these entries and none of them was called as witnesses.  The business record information in the Loss Mitigation Notes and the Servicing Notes may be evidence—but it is not conclusive evidence.  The Court thus gives such information little weight when it conflicts with testimony of Teresa Davis and Christopher Davis who have first-hand knowledge, were subject to cross examination at trial, and the Court finds are credible witnesses.  *See Wolff v. Rodgers Consulting, Inc.*, 2012 U.S. Dist. LEXIS 70559, at *8 (D. Md. May 18, 2012) *(*"It is within the complete providence of the trier of fact to judge the credibility and accuracy of witness testimony and to weigh such testimony accordingly.")*.  See also Anderson v. Bessemer City,* 470 U.S. 564, 573-74 (1985) (finding that the appeals court cannot reverse the trial court's decision on the grounds that it would have weighed the evidence differently if it were the trier of fact so long as the trial court's interpretation is plausible).

[8]  Deed dated August 25, 2005 [Plaintiffs' Exhibit 1].

PNC is, and at all relevant times was, the servicer for the first mortgage loan secured by a deed of trust on the Property (the "Deed of Trust").[9]  The holder of the promissory note (the "Note") secured by the Deed of Trust is 21st Mortgage Corporation, as Master Servicer for Christiana Trust, a division of Wilmington Savings Fund Society, FSB as Trustee for Knoxville 2012 Trust ("21st Mortgage Corporation").

Under the Note, the Davises borrowed $545,245.00 to be repaid on an interest only basis for ten years.  After that the loan would convert automatically on October 1, 2015 to a 20-year fully amortizing loan due to be paid in full by September 1, 2035.[10]

The present dispute arose years later when PNC sent the Davises a mortgage billing statement requiring a payment of $51,372.48 by April 1, 2016 (the "Mortgage Statement").[11]  The Mortgage Statement indicated that (i) the Davises owed PNC a current monthly payment of $3,019.18, plus past due amounts of $48,353.30, and (ii) PNC was holding unapplied funds of $6,378.27, apparently derived from various partial payments made by the Davises.  Around the same time, PNC sent the Davises a separate letter containing "delinquency notice information" asserting the total due to PNC (after taking into account the unapplied funds) was only $41,975.03 (the "Delinquency Letter").[12]  PNC calculated both of these alleged delinquencies based upon the original loan terms rather than those of the mortgage modification agreement at the center of this dispute.  This adversary proceeding is in large part about whether PNC had the right to collect the substantial delinquency it asserted in March of 2016.  The Court concludes that it did not.

---

[9]  Purchase Money Deed of Trust, executed on August 25, 2005 [Plaintiffs' Exhibit 2].
[10]  Adjustable Rate Note and Interest Only Payment Period Addendum to Adjustable Rate Note, both dated August 25, 2005 [Defendant's Exhibit 1].
[11]  Mortgage Statement dated March 16, 2016 [Plaintiffs' Exhibit 8].
[12]  Letter dated March 16, 2016 [Plaintiffs' Exhibit 9].  The letter was unsigned, did not contain the name of its author, and contained a signature block that simply read "Sincerely, PNC Mortgage."

By reason of the alleged delinquency, PNC scheduled a foreclosure sale of the Property for April 25, 2016.[13]  On April 22, 2016, however, the Davises filed a voluntary petition in this Court seeking relief under Chapter 13 of Title 11 of the United States Code (the "Bankruptcy Code").[14]

On January 25, 2017, Brian McNair as the attorney for PNC filed a motion for relief from the automatic stay under § 362(d) of the Bankruptcy Code (the "Lift Stay Motion") so PNC could continue with foreclosure proceedings.[15]  It states: "A Loan Modification Agreement was completed and executed by the parties herein.  A copy of the loan modification is attached hereto as Exhibit D."[16]  Exhibit D was a copy of a Home Affordable Modification Agreement bearing the notarized signatures of the Davises as recorded in the Land Records of Carroll County, Maryland at Liber 8179, Folio 222 on December 16, 2015 (the "Modification Agreement").[17]

In their Response to the Motion for Relief (the "Response"),[18] the Davises recount the events surrounding the Modification Agreement.  After a few continuances pending resolution of this adversary proceeding, PNC filed an amended motion for relief from the automatic stay on January 9, 2018 (the "Amended Lift Stay Motion")[19] to address that it has "removed" the Modification Agreement and that "the aforementioned loan modification agreement is invalid."[20]  The Davises opposed the Amended Lift Stay Motion, asserting—among other things—that PNC

---

[13] PNC Response to Request for Admission No. 9 [Plaintiffs' Exhibit 48, at p. 5].

[14] *In re Christopher Davis and Teresa Davis*, Case No. 16-15555-DER (the "Main Case").  The Davises paid the filing fee for their petition of $310.00.  Main Case Docket No. 3.  They agreed to pay their attorney a fee of $4,625.00 for representation in the Main Case.  Main Case Docket No. 72.

[15] Main Case Docket No. 77 [Plaintiffs' Exhibit 19].  In the Lift Stay Motion, PNC states that it is acting as the servicer for 21st Mortgage Corporation.

[16] *Id.* ¶ 7, at Page 2 of 5.

[17] Main Case Docket No. 77-2, at Pages 33 to 42 of 44 [Plaintiffs' Exhibit 19].  Apart from the redactions, this is the same document as the copy of the Modification Agreement admitted into evidence as Defendant's Exhibit 3.  Both copies of the Modification Agreement as recorded are incomplete in the sense that they do not include a copy of the Land Instrument Intake Sheet recorded at Liber 8179, Folio 232.  The entire Modification Agreement as recorded in Carroll County (where the Property is located) was admitted into evidence as Plaintiffs' Exhibit 7.

[18] Main Case Docket No. 79.

[19] Main Case Docket No. 111 [Defendant's Exhibit 55].

[20] *Id.* ¶ 6, at Page 2 of 5.  The gist of PNC's basis for this assertion is essentially the same as the defense mounted in this adversary proceeding.

"has been on actual notice of the recorded modification for almost two (2) years and is only now amending the Motion for Relief filed more than a year ago."[21]   A hearing on the Lift Stay Motion and the Amended Lift Stay Motion is now scheduled for February 10, 2021.

Five months before filing the Lift Stay Motion, Brian McNair as the attorney or authorized agent for 21st Mortgage Corporation filed its proof of claim on August 26, 2016 asserting that it held a claim in the amount of $596,473.91 secured by the Property.[22]   A few days later he filed an objection to confirmation of the Davises' proposed Chapter 13 plan asserting arrearages of $65,893.10.[23]   In their response to this objection the Davises alleged that the state foreclosure proceeding that necessitated this bankruptcy relied on the recorded Modification Agreement.[24] The foreclosure proceeding was filed by Brian McNair's law firm.   No evidence was introduced at trial as to whether PNC actually relied upon the Modification Agreement in the state court foreclosure proceeding.   If it was not relied upon there, it is difficult for the Court to understand how an experienced attorney such as Brian McNair would mistakenly turn around and rely on it in the Life Stay Motion only a few months later.   PNC has offered no explanation apart from the Amended Lift Stay Motion, which sets forth little more than a statement of position.

### The Prior Bankruptcy Case

In any event, understanding the Modification Agreement requires understanding events that took place in an earlier bankruptcy case.   On November 4, 2014 the Davises filed their first Chapter 13 case.[25]   Until January 4, 2016, Joseph Laumann represented the Davises in that case.[26]

---

[21] Main Case Docket No. 113.
[22] Main Case Claims Docket, Claim No. 9-1 [Defendant's Exhibit 45].   The proof of claim identifies PNC as the servicer for the loan and as the party who should receive notices and payments on behalf of the creditor, which is identified as 21st Mortgage Corporation.
[23] Objection to Confirmation of Plan, Main Case Docket No. 40.
[24] Debtors' Response to Trustee's [*sic*] Objection to Confirmation of Chapter 13 Plan, Main Case Docket No. 53.
[25] *In re Christopher Patrick Davis and Teresa Lynn Davis*, Case No 14-27008-DER (the "Prior Case").
[26] Notice of Withdrawal of Appearance and Substitution of Counsel, Prior Case Docket No. 101.   Thereafter, the Davises were represented by attorney Mary Albrecht Jordan.   The Court of Appeals of Maryland indefinitely

Their Chapter 13 plan provided for the payment of arrears due to PNC in equal monthly payments and was confirmed on June 17, 2015.[27]  Later that year on November 5, 2015, Laumann filed a motion on behalf of the Davises seeking approval of the Modification Agreement with PNC, which seemingly increased their monthly payment amount by more than $800.00 (the "HAMA Motion") due to the conversion of the payment from interest only to principal and interest.[28]  In reality, as of October 2015 the Note under its original terms automatically converted the loan to principal and interest, increasing the monthly payment to $3,628.36—meaning the Modification Agreement in truth reduced the monthly payment by $620.96.  A hearing on the HAMA Motion was scheduled for January 13, 2016.[29]  Because of the apparent increase in the monthly payment, the Chapter 13 trustee objected to the HAMA Motion (the "Objection").[30]  The HAMA Motion, the Hearing Notice, and the Objection were each served electronically on Brian McNair as counsel for PNC.[31]

---

suspended Joseph Laumann from the practice of law on May 14, 2018.  *Attorney Grievance Commission of Maryland v. Laumann*, 459 Md. 164 (2018).

[27]  Order Confirming Plan, Prior Case Docket No. 67.

[28]  Motion for Authority to Incur Secured Debt for the Purpose of Modifying the Terms of an Existing Secured Loan for Real Property and Notice of Opportunity to Object, Prior Case Docket No. 82 [Defendant's Exhibit 36].  The HAMA Motion indicates that (i) the Davises' new monthly payment would be $3,007.40 (which included a monthly escrow payment of $677.85), and (ii) their then current monthly payment was $2,184.00.  Thus, the proposed modification seemed to increase the monthly payment on the loan by $823.40—an impression that was inaccurate for several reasons.  The most important reason being that PNC filed a Notice of Mortgage Payment Change on July 21, 2015 in which PNC notified the Davises that effective October 1, 2015 their monthly payment increased to $3,628.36, an amount that incorporated an interest rate change and the conversion of the loan from interest only to one fully amortizing by September 1, 2035.  Thus, the proposed loan modification did not increase the monthly payment but rather decreased it by $620.96 ($3,628.36 minus $3,007.40).  The HAMA Motion may not have been artfully drafted and the Davises, their attorney, and the Chapter 13 Trustee may have been unclear about the benefits of the proposed loan modification, but PNC and its attorney were at all times aware that the modification would reduce the amount of the then monthly payment from $3,628.36 to $3,007.40.

[29]  Notice of Motion for Authority to Incur Secured Debt for the Purpose of Modifying the Terms of an Existing Secured Loan for Real Property and Notice of Opportunity to Object, Prior Case Docket No. 84 (the "Hearing Notice") as amended by the Court's Deficiency Notice issued on November 5, 2015, Prior Case Docket No. 85 [Defendant's Exhibit 38].

[30]  Objection to Debtors' Motion to Approve Loan Modification, Prior Case Docket No. 89 [Defendant's Exhibit 40].  The Chapter 13 Trustee also objected on the ground that "[d]ocumentation of the loan modification terms are not attached to the motion."

[31]  Brian McNair entered an appearance on behalf of PNC on November 21, 2014.  Line Entering Appearance and Request for Service of Notice, Prior Case Docket No. 22 ("You are hereby given notice that Brian McNair has been engaged by the creditor identified below to serve as its authorized agent in this matter: PNC Bank, NA. and its successors and/or assigns.").  As a result, he was thereafter automatically given electronic notice of all pleadings, notices and docket entries in the Prior Case.

Subsequently, Joseph Laumann filed an amended HAMA Motion on November 19, 2015 (the "Amended HAMA Motion").[32]  The hearing on approval of the proposed loan modification remained set for January 13, 2016.[33]  Because of the apparent increase in the monthly payment, the Chapter 13 trustee again objected (the "Second Objection")[34] and PNC was again served with the Amended HAMA Motion, the Amended Hearing Notice, and the Second Objection through Brian McNair as its counsel.

Approval of the Modification Agreement was derailed when PNC sent the Davises an unexpected and surprising letter in December of 2015—a letter that PNC now characterizes as an exercise of its supposed unilateral right to terminate the Modification Agreement at any time prior to execution of the agreement by PNC (the "Termination Letter").[35]  As explained below, the Termination Letter contained a false explanation for PNC's action, telling the Davises that: "After being offered a Trial Period Plan or Home Affordable Modification you notified us on December 22, 2015 that you did not wish to accept the offer."[36]

---

[32] Amended Motion for Authority to Incur Secured Debt for the Purpose of Modifying the Terms of an Existing Secured Loan for Real Property and Notice of Opportunity to Object, Prior Case Docket No. 91 [Defendant's Exhibit 41].  The Amended HAMA Motion is accompanied by a copy of a Home Affordable Modification Agreement signed by the Davises that provides for a monthly payment as of November 1, 2015 of $3,007.40.  For reasons unknown to the Court, the Amended HAMA Motion incorrectly identifies the new monthly payment as $3,101.17 (which was the monthly payment during the TPP (defined below) offered by PNC and accepted by the Davises).  The Amended HAMA Motion again failed to make clear that the monthly payment increased from the one that existed when the case was commenced because the loan converted from interest only to fully amortizing effective October 1, 2015.  Regardless of the inaccuracies in the Amended HAMA Motion, PNC and its attorney were aware that the proposed modification would reduce the monthly payment made by the Davises from $3,628.36 to $3,007.40.

[33] Amended Notice of Motion for Authority to Incur Secured Debt for the Purpose of Modifying the Terms of an Existing Secured Loan for Real Property and Notice of Opportunity to Object, Prior Case Docket No. 92 (the "Amended Hearing Notice").

[34] Objection to Debtors' Amended Motion to Approve Loan Modification, Prior Case Docket No. 95 [Defendant's Exhibit 42] ("The Trustee questions how the loan modification is in the Debtors' best interest.  Pursuant to paragraph 3 of the Debtors' Motion, the Debtors will now be paying over $800 a month more in mortgage payments than before the modification.").

[35] Letter dated December 22, 2015 [Defendant's Exhibit 20].  The letter was unsigned, did not contain the name of its author, and contained a signature block simply read "Sincerely, PNC Mortgage."

[36] *Id*.

After postponing the January 13, 2016 hearing on approval of the Modification Agreement through their new counsel, Mary Albrecht Jordan, the Davises ultimately sought dismissal of the Prior Case on March 10, 2016.[37]  The Court dismissed the Prior Case the following day.[38]  At that point, bankruptcy court approval was no longer an operative condition under the Modification Agreement.

### The Origin of the Loan Modification Agreement with PNC

The Davises pursuit of a loan modification agreement with PNC predated the filing of the Prior Case.  In April of 2013, Teresa Davis was given notice by Northrop Grumman that she would be laid off due to the federal government budget sequestration.  A five-month period of employment and economic uncertainty for the Davises thus began.  Teresa Davis's official notice came in May of 2013 when her manager told her to go home for two weeks to find other employment.[39]  When she returned two weeks later to get debriefed and turn in her badge, Northrop Grumman offered her job back temporarily until July 26, 2013.[40]  In July, she was told that her layoff was delayed yet again to August 30, 2013.[41]  Lastly, in August, for what proved to be the final time the effective date of her layoff was delayed to October 4, 2013.[42]  On October 1, the

---

[37]  Motion to Dismiss, Prior Case Docket 116.  In that motion, the Davises state that they were seeking to voluntarily dismiss the Prior Case because, "After lengthy review and communications with counsel for the Trustee, it became clear that the Debtors' goal in filing the instant case, including addressing federal tax debt and properly stripping a second lien attached to their residence, cannot be properly achieved within the confines of this instant case in accordance with the rules of this Court and the Bankruptcy Code."  The motion makes no reference to the Modification Agreement.

[38]  Order Dismissing Case, Prior Case Docket No. 117 [Defendant's Exhibit 44].

[39]  Memorandum re Notification of Layoff – Reduction in Force dated May 21, 2013 [Plaintiffs' Exhibit 22] ("I regret to inform you that due to a reduction in funding, you are being notified of layoff.  This memo serves as your written notice that your layoff will be effective June 4, 2013.").

[40]  Memorandum re Revision of Layoff Effective Date dated June 4, 2013 [Plaintiffs' Exhibit 23] ("A Notification of Layoff memo was provided to you on 5/21/13 stating that 6/4/13 would be your last day of employment.  This memo serves as your written notice that the anticipated effective date of your layoff has been changed to 7/26/13.").

[41]  Memorandum re Revision of Layoff Effective Date dated July 18,2013 [Plaintiffs' Exhibit 24] ("A Notification of Layoff memo was provided to you on 5/21/13 stating that 6/4/13 would be your last day of employment.  This memo serves as your written notice that the anticipated effective date of your layoff has been changed to 08/30/13").

[42]  Memorandum re Revision of Layoff Effective Date dated August 28,2013 [Plaintiffs' Exhibit 25] ("A Notification of Layoff memo was provided to you on 5/21/13 stating that 6/4/13 would be your last day of employment.  This memo serves as your written notice that the anticipated effective date of your layoff has been changed to 10/4/13").

layout was rescinded.[43]  In sum, although she was under constant threat of layoff for five months and was only employed temporarily, Teresa Davis remained at work until she received another permanent position effective on November 18, 2013, a position that amounted to a 25% reduction in pay because the government contract funding only provided for 30 hours per week.

At the beginning of this five-month ordeal, Teresa Davis contacted PNC about the possibility of a modification of her mortgage loan.  PNC advised her that her loan needed to be three months behind in payments before the Davises could start the loan modification process. And so, the Davises did not make their mortgage payments to PNC for the months of April, May, and June of 2013 and then requested, completed, and submitted a formal loan modification application.[44]

Following their initial application up until they received the October 21, 2015 approval for a modification, the Davises were in constant contact with PNC.  They grew frustrated with numerous requests by PNC for additional documentation—often requests for documentation they had previously provided but that became out of date while PNC was waiting on other documents. In January 2014 they were told that the laws had changed so they needed to start the exasperating application process over again.  They did so.[45]  Although Teresa Davis was no longer under threat of layoff, by this time the Davises were many months behind on their mortgage and wanted to continue with the modification process in order to get out of the interest-only loan and modify it

---

[43]  Memorandum re Rescission of Reduction in Force/Layoff Notice dated October 1, 2013 [Plaintiffs' Exhibit 26] ("I am pleased to inform you that your layoff which was to take effect on October 4, 2013 has been rescinded and you will continue your at-will employment with Northrop Grumman.").

[44]  Making Home Affordable Program Request for Mortgage Assistance dated June 24, 2013 [Plaintiffs' Exhibit 29].

[45]  Making Home Affordable Program Request for Mortgage Assistance dated January 21, 2014 [Plaintiffs' Exhibit 30].

to a principal and interest loan. At this point, the Davises were notified by PNC that their loan was being referred for foreclosure.[46]

The frustrating process to obtain a loan modification and foreclosure threats created understandable mental distress for the Davises. It included numerous duplicative requests for payroll documents from the Davises' employers that caused embarrassment—at one point leading the Davises to separate and contemplate divorce.[47] On other occasions PNC hung notices on their house informing them of scheduled foreclosures causing more embarrassment and distress. Between June 2013 and the end of 2015, PNC's records indicated that the Davises personally had at least fifty phone calls with PNC.[48] The Davises testified about the ultimate distress caused by the actions of PNC during these years—the fear they would lose the house they had built and raised their children in to foreclosure because PNC told them they had to be delinquent on payments before PNC would consider modifying their mortgage.

---

[46] Letter dated January 9, 2014 [Defendant's Exhibit 6] ("Your loan has been reviewed by our foreclosure committee and has been approved for referral to the foreclosure department. Please note that all foreclosure activity will continue until a mortgage workout program is approved."). The letter was unsigned, did not identify the name of its author, and contained a signature block that simply read "Sincerely, PNC Mortgage." By letter dated February 18, 2014, counsel for PNC notified the Davises that a foreclosure action would be commenced. Letter dated February 18, 2014 [Defendant's Exhibit 7] ("Our office has been instructed to institute foreclosure proceedings."). On February 21, 2014, PNC sent the Davises Notices of Intent to Foreclose. Affidavit dated February 21, 2014 [Plaintiffs' Exhibit 20]. Thereafter, PNC notified the Davises that their request for a loan modification was denied. Notice dated March 31, 2014 [Defendant's Exhibit 8] ("Based on a review of the information you provided, we are unable to offer mortgage payment assistance to you at this time."). The Notice was printed on PNC Mortgage letterhead, but is unsigned, did not identify the name of its author, and did not contain a signature block.

[47] PNC insinuated many times during trial that because Christopher Davis never moved out of the Property that the Davises falsified their various hardship affidavits because they never separated. The Court rejects this contention. Teresa Davis testified that the Davises slept in separate bedrooms, consulted divorce attorneys, and didn't speak for often weeks at a time despite living under the same roof. Their reality at the time was that they simply couldn't afford to hire divorce attorneys or pay for another domicile for Christopher Davis. The credible testimony by the Davises demonstrates that their marital difficulties stemming from their financial problems and frustration with PNC were serious and threatened their relationship to the point that they essentially isolated themselves from each other. In any event, the circumstances were made known to and clarified for PNC before it offered the Modification Agreement. Making Home Affordable Program Hardship Affidavit dated May 8, 2015, at p. DX012-004 [Defendant's Exhibit 12] ("Unfortunately the length of time of consistently being threatened to lose our primary source of income had an extremely negative impact on our marriage. We separated for over a year and even consulted divorce attorneys. We have recently agreed to attempt reconciliation for the sake of our four children. We do not want to lose our home, this house is where we've raised our children.").

[48] Loss Mitigation Notes [Defendant's Exhibit 22], at pp. DX022-027 to DX022-068.

Eventually, the Davises were notified that a foreclosure sale of the Property by public auction was scheduled to be held on November 10, 2014.[49]  That sale was automatically stayed when the Davises commenced the Prior Case in this Court on November 4, 2014.

### The Trial Period Plan

After filing the Prior Case, the Davises were undeterred and pressed on with efforts to obtain a mortgage modification with PNC.  Their efforts were successful.  In June 2015, PNC offered them a trial period plan (the "TPP") under the Home Affordable Modification Program ("HAMP").[50]  In the TPP Letter, PNC advised the Davises that, "You have been approved for a conditional Trial Period Plan."  The TPP Letter further states:

> This is the first step toward qualifying for more affordable mortgage payments or manageable terms.  Please review the terms and follow the instructions thoroughly so that you can decide whether you would like to accept this Trial Period Plan offer and, if so, *you will know how to successfully complete the Trial Period Plan and permanently modify your mortgage*.[51]

In the TPP Letter, PNC described the terms of the TPP it was offering to the Davises:

> The terms of your Trial Period Plan below are effective on the day you make your first trial period payment, provided we have received it on or before August 1, 2015.
>
> After all the trial period payments are made on time and you have submitted the required documents, and if you continue to qualify, *your mortgage will be permanently modified*.  Your existing loan and loan requirements remain in effect and unchanged during the trial period.  If each payment is not received by PNC Mortgage in the month in which it is due, *this offer will end and your loan will not be modified under the terms described in this offer*.[52]

---

[49]  Letters dated October 23, 2014 [Plaintiffs' Exhibit 21].  The letters were unsigned but were sent on letterhead and with a blank signature block for the Alba Law Group, P.A. law firm.

[50]  Letter dated June 18, 2015 [Defendant's Exhibit 14] (the "TPP Letter").  Like many—if not all—of PNC's correspondence and documents here, the TPP Letter was not signed by anyone on behalf of PNC, does not identify its author, and does not contain a signature block.

[51]  *Id*., at p. DX014-003 (emphasis added).

[52]  *Id*. (emphasis added).  There can be no question that PNC regarded the TPP Letter as an offer.  It was accompanied by preprinted form correspondence to be signed and returned by the Davises—a form that was titled "Offer Acceptance" and included a statement as follows: "With my signature, I agree to the offer described in full in this letter dated June 18, 2015."  *Id*., at p. DX014-006.

It also set forth what PNC described as the "instructions for accepting the conditional Trial Period Plan," which required the Davises to (i) "[c]omplete and return the attached Offer Acceptance page" by July 2, 2015, and (ii) "[m]ake the first payment under the Plan" by August 1, 2015.[53] The Davises accepted the TPP and made the required payments of $3,101.17 for the months of August, September, and October 2015.

### The Modification Agreement

In October 2015, PNC sent the Davises a letter that offered them the Modification Agreement (the "HAMA Letter").[54]  That letter read:

> **Congratulations!**  You are eligible for a Home Affordable Modification.  As previously described, if you comply with the terms of the Home Affordable Modification Trial Period Plan, we will modify your mortgage loan and waive all prior late charges that remain unpaid.
>
> The enclosed Home Affordable Modification Agreement ("Modification Agreement") reflects the proposed terms of your modified mortgage.
>
> **How to Accept This Offer:**
>
> **Step 1  COMPLETE AND RETURN THE ENCLOSED AGREEMENT BY THE DUE DATE**
>
> To accept this offer, **you must sign and return both copies** of the Modification Agreement to us in the enclosed, pre-paid envelope by **11/04/15**. … If you do not send both signed copies of the Modification Agreement by the above date, you must contact us if you still wish to be considered for this program and have your loan modified.
>
> **Step 2  CONTINUE TO MAKE YOUR TRIAL PERIOD PAYMENTS ON TIME**
>
> Be certain to make any remaining trial period payments on or before the dates they are due. ….[55]

---

[53]  *Id*., at p. DX014-004 (referring to the preprinted form correspondence at page DX014-006).

[54]  Letter dated October 21, 2015 [Plaintiffs' Exhibit 3] (A copy of the letter with enclosures was also admitted into evidence as Defendant's Exhibit 17).  Like the TPP Letter, the HAMA Letter also was not signed by anyone on behalf of PNC, does not identify its author, and does not contain a signature block.

[55]  *Id*., at p. DX017-001 (emphasis in original).

These two conditions for acceptance of PNC's offer are the only ones stated in the HAMA Letter. Nothing in the HAMA Letter states that PNC's offer is conditioned on bankruptcy court approval let alone approval by any deadline; it makes no reference to bankruptcy court approval whatsoever. While PNC disputes whether the Davises complied with Step 1, the Court finds that they completed both Step 1 and Step 2, thereby accepting the offer made in the HAMA Letter. As a result, PNC was contractually obligated to modify the loan and execute the Modification Agreement once the Davises satisfied the conditions stated in the Modification Agreement.

The HAMA Letter was accompanied by two copies of the Modification Agreement, a Temporary Payment Coupon for the first modified loan payment,[56] a return envelope, a prepaid return Federal Express label, and a second letter containing instructions for the Davises signatures to be notarized without cost by Title First Agency.[57] Around that time, PNC also sent a letter to the Davises then attorney, Joseph Laumann, with instructions for bankruptcy court approval of the Modification Agreement.[58] PNC sent a similar letter to Ellen Cosby, the Chapter 13 trustee in the

---

[56] Temporary Payment Coupon dated October 21, 2015 [Plaintiffs' Exhibit 3, at p. DAVIS00000192]. The Temporary Payment Coupon contained instructions that stated: "Below is your temporary coupon. Please return the coupon with the payment due when returning the two signed modifications. Your modifications will need to be notarized if instructed. Going forward you will receive a monthly bill." No evidence was introduced at trial to demonstrate that PNC ever sent, or the Davises ever received, any monthly bills for modified loan payments of $3,007.40 due on or after December 1, 2015.

[57] Letter undated and addressed to "Dear Borrower" [Plaintiffs' Exhibit 4]. The letter stated in part: "Since your HAMP modification documents require your signature(s) to be notarized, we have contracted with a company to make it easy for you. The company is Title First Agency and their service will be paid for by PNC Mortgage. They will be contacting you by phone to set up a convenient time to take care of this for you." The letter is unsigned, did not identify the name of its author, and contained a signature block that simply read "Thank you, PNC Mortgage."

[58] Letter to Joseph Laumann dated October 21, 2015 [Defendant's Exhibit 15]. Again—the letter was unsigned, did not identify the name of its author, and contained a signature block that simply read "Sincerely, PNC Mortgage Customer Advocacy Group." The letter reads:

> The above reference client has recently been qualified for a HAMP modification under the Home Affordable Modification Program. Please be advised PNC Mortgage must obtain a signed court order approving the modification by the bankruptcy court before we can officially approve and begin the modification process. Please refer to the modification included in this mailing for specific deadlines to assist our client. In addition, PNC Mortgage must be notified of the approval process steps as follows:
> - PNC must be notified when the motion is filed requesting the Court approval hearing.
> - PNC must be notified of the date of the Court approval hearing once scheduled.

Prior Case.[59]  Neither the Modification Agreement[60] nor the letters to Joseph Laumann and Ellen Cosby specified any deadline—much less a 60-day deadline—for the Davises to obtain approval of the Modification Agreement from this Court.  Moreover, nothing in any of those documents indicates that PNC retained a unilateral right prior to affixing its signature to simply terminate the Modification Agreement.

When the Davises received the HAMA Letter they were relieved and excited by the news that they were at last being offered a loan modification.  Teresa Davis contacted PNC about Title First Agency and was told that "we were fine to go to a PNC branch of the bank and have them notarized there."[61]  On Saturday, October 31, 2015, the Davises went to the PNC branch in Mount Airy, Maryland and signed the Modification Agreement in front of a notary.  That same day they deposited the signed Modification Agreement in a Federal Express drop box using the return label provided by PNC.[62]  On Monday, November 2, 2015, Teresa Davis called PNC and informed PNC

---

■   PNC must be notified of the Court's decision regarding approval or denial of the HAMP Modification immediately following that decision.
Upon receipt of Court approval or *in the case of discharge or dismissal*, PNC must receive the signed HAMP Modification within 15 calendar days from the decision date.  Failure to return the signed HAMP Modification within 15 days will result in removal from the HAMP program.

*Id.* (emphasis added).  These instructions are not only confusing but differ in some ways from those in the HAMA Letter.  Significantly, the letter to Joseph Laumann makes clear that the requirement for bankruptcy court approval was not applicable when (as eventually happened here) a bankruptcy case is dismissed.

[59] Letter to Ellen W. Cosby dated October 21, 2015 [Defendant's Exhibit 16].  Yet another letter that was unsigned, did not identify the name of its author, and contained a signature block that simply read "Sincerely, PNC Mortgage Customer Advocacy Group."  Nothing in PNC's letter to Ellen Cosby indicated there was any deadline by which PNC expected the Modification Agreement to be approved by the bankruptcy court.

[60] The only reference in the Modification Agreement to bankruptcy court approval is the representation made by the Davises in Section 3(H) that "I have obtained all necessary approvals for acceptance of this Modification required by the Bankruptcy Court and the trustee appointed to my bankruptcy case."

[61] Testimony of Teresa Davis, July 29, 2019 Transcript, at p. 62, lines 16-18 [Docket No. 106, Page 62 of 248].

[62] PNC went to great lengths to try to establish through testimony by Dorothy Thomas about its business records that PNC never received the notarized Modification Agreement signed by the Davises.  PNC introduced its record of the out bound and return Federal Express shipping labels that were enclosed with the HAMA Letter [Defendant's Exhibit 25].  The return tracking number was indicated therein to be 795080882513 (the "Return Tracking Number").  PNC's records indicated that the Return Tracking Number was not recorded for any Federal Express package received by PNC between October 20, and December 17, 2015 [Defendant's Exhibit 24].  Although the shipping labels that accompanied the TPP Letter were introduced [Defendant's Exhibit 14, at p. DX014-002], the evidence before the Court does not include a copy of the actual return Federal Express shipping label enclosed with the HAMA Letter.  Based upon the evidence, the Court finds that either (i) the Return Tracking Number was not the one on the label enclosed with the HAMA Letter, (ii) the PNC receipt records for Federal Express packages were mistaken, or (iii) the

that the Modification Agreement had been signed and returned, and that the first payment would be made at the Mount Airy branch of PNC.[63]  After that, (i) the HAMA Motion was filed on Friday, November 5, 2015,  (ii) the Davises made the first payment due under the Modification Agreement at the Mount Airy branch of PNC on Saturday, November 6, 2015,[64]  (iii) and the Amended HAMA Motion attempting to cure the deficiencies that led to the Chapter 13 Trustee's Objection was filed on November 19, 2015.[65]  Thus, PNC was on notice at the latest by November 19, 2015 that (a) the Davises intended to proceed with the Modification Agreement, (b) they had filed a motion for approval of the Modification Agreement, and (c) the Court had scheduled a hearing on January 13, 2016 for the purpose of determining whether to approve the Modification Agreement.  At no time did PNC advise the Davises that the hearing on approval of the Modification Agreement was scheduled for a date after expiration of a secret 60-day deadline.

PNC has argued that the Modification Agreement was procured by the Davises by means of false statements made in their various hardship affidavits and letters submitted to PNC.  The Court rejects this contention.  PNC relies primarily on its contention that (i) Teresa Davis was not unemployed or laid off, and (ii) the Davises were never separated.  The evidence shows that their employment and marital problems were real and that those problems materially impacted their financial circumstances.  The Davises accurately disclosed their circumstances to PNC in a letter

---

return shipping label enclosed with the HAMA Letter was addressed to Title First Agency.  In any of those circumstances, the Modification Agreement was timely returned by the Davises to PNC as instructed in the HAMA Letter.  That instruction was to return the Modification Agreement using the enclosed pre-paid label.  The Court finds that the Davises did so.

[63]  The corresponding entry in the PNC Loss Mitigation Notes confirms that Teresa Davis made the call, and states in relevant part as follows: "BWR STATED ALREADY MAILED MOD DOCS STATED WILL TAKE 1ST PMT TO PNC BRANCH."  Defendant's Exhibit 22, at p. DX022-027.  As of November 2, 2015, PNC was therefore on notice that the Davises intended to proceed with the Modification Agreement, had returned the signed Modification Agreement, and would make the first modified loan payment.

[64]  Receipt dated November 7, 2015 [Plaintiffs' Exhibit 6].

[65]  Attached to the Amended HAMA Motion was a copy of the Modification Agreement signed by the Davises without notarization.  Copies of the Amended HAMA Motion and the Amended Hearing Notice were served by the Court's CM/ECF system on PNC's attorney, Brian McNair.

that accompanied the hardship affidavit submitted shortly before PNC offered the TPP.[66]  Their

statements to PNC on these subjects were not false—they were truthful and were backed up by

their credible testimony at trial.

### The False Termination Letter

In December 2015 shortly before Christmas Day, the Davises became aware of PNC's

attempt to terminate the Modification Agreement when they received the Termination Letter that

PNC contends revoked its offer of the Modification Agreement.[67]  The Termination Letter reads:

> We have completed our review of your hardship assistance request under the
> Making Home Affordable Program (MHAP).  However, we are unable to
> proceed further with your request for assistance for the following reason(s):
>
> **- Offer Not Accepted by Borrower/Request Withdrawn**
>
> We are not considering your request for modification because:
>
> After being offered a Trial Period Plan or Home Affordable Modification you
> notified us on December 22, 2015 that you did not wish to accept the offer.[68]

---

[66] Hardship Affidavit dated May 8, 2015 [Defendant's Exhibit 12], at p. DX012-004.  PNC's relies on the mysterious letter dated October 25, 2016 [Defendant's Exhibit 28].  That reliance is misplaced.  Whatever its origins or accuracy, that letter was not relied upon by PNC when it offered the TPP or made the offer in the HAMA Letter.  The letter was apparently transmitted long after the events that gave rise to the Modification Agreement.  The Court finds that, as represented by the Davises in Section 1(E) of the Modification Agreement under penalty of perjury, all documents and information submitted to PNC were true and correct.

[67] Letter dated December 22, 2015 [Defendant's Exhibit 20; Plaintiffs' Exhibit 16].  Not surprisingly by now—the letter was unsigned, did not identify the name of its author, and contained a signature block that simply read "Sincerely, PNC Mortgage."  The Court has taken pains to point out the many unsigned documents with no acknowledgement of the individual at PNC making any decisions or taking ownership of any action by PNC.  The Court points this out for two reasons.  First, PNC clearly considered these many unsigned letters, notices, and offers sent to the Davises to be legally binding action by PNC—despite the lack of the formality of a blue ink on white paper traditional signature by a PNC representative.  That being the case, PNC's adamant insistence on the supposed legal significance of the absence of such a signature on the Modification Agreement rings hollow.  Second, this pattern among financial institutions appearing before this Court of operating in a manner where no individual appears responsible for any decisions is concerning.  Such institutions often, including during trial here, insist that no individual is making decisions on their behalf—the computer is.  These institutions rarely call witnesses with first-hand knowledge of any events to testify and seem to believe pleading inability to control the decisions of a computer program will shield them from any wrongdoing.  This is simply not a credible defense to any mistake, violation of the automatic stay, violation of the discharge injunction, or other similar bad acts.

[68] *Id.* (emphasis in original).

This was simply false.  PNC knew when it sent this letter that it was false.  PNC knew that the Davises had not contacted PNC to withdraw their request for a loan modification.  PNC maintained electronic records of the actions of its loan servicing employees that included the Loss Mitigation Notes[69] and the Servicing Notes.[70]  From October 21, to December 22, 2015, the Loss Mitigation Notes contain 15 sets of entries, none indicating the Davises notified PNC of any desire to abandon the Modification Agreement they had struggled so long to obtain.[71]  Teresa Davis testified credibly that the Davises never did so.[72]  In her testimony, Dorothy Thomas conceded that the Davises had not done so.[73]

So why did PNC revoke the offer?  Because it had imposed a 60-day deadline by which the Davises were supposedly required to obtain bankruptcy court approval of the Modification Agreement—a deadline never disclosed to the Davises, their attorney, the Chapter 13 trustee, or this Court.  The 60-day deadline was a secret.

Regardless, PNC argues that the false statement made in the Termination Letter was accurate because the following indicated that the Davises were no longer interested in mortgage assistance:  (a) PNC had no record of receipt of the signed Modification Agreement, and (b) the

---

[69] LMT Process Notes [Defendant's Exhibit 22] (covering the period from December 1, 2011 to May 16, 2017).  A separate set of the Loss Mitigation Notes was introduced by the Davises.  LMT Process Notes [Plaintiffs' Exhibit 15] (covering the period from February 11, 2015 to May 16, 2017).  For the relevant time period, these two exhibits appear to be identical.

[70] SER Process Notes [Defendant's Exhibit 23].  In her testimony on the witness stand, Dorothy Thomas indicated that PNC maintained a third set of electronic notes known as the Bankruptcy Notes.  Apparently, the Bankruptcy Notes were never produced by PNC.  Testimony of Dorothy Thomas, July 29, 2019 Transcript, at p. 231, line 12 through p. 232, line 9 [Docket No. 106, Pages 231-32 of 248]; July 30, 2019 Transcript, at p. 52, lines 9-24 [Docket No. 107, Page 52 of 193].  In any event, the Bankruptcy Notes were not introduced into evidence.

[71] LMT Process Notes [Defendant's Exhibit 22, pages DX022-027 to DX022-028].  The recorded communications in the Loss Mitigation Notes are all consistent with the intent of the Davises to proceed the Modification Agreement.

[72] When asked if PNC's statement in the Termination Letter was true, Teresa Davis testified: "No, that is not true.  Why would we withdraw something that we waited all of those years for?  We worked so hard to get it, why would we withdraw it?" Testimony of Teresa Davis, July 29, 2019 Transcript, at p. 69, lines 20-22 [Docket No. 106, Page 69 of 248].

[73] Testimony of Dorothy Thomas, July 29, 2019 Transcript, at p. 227, lines 7-10 [Docket No. 106, Pages 227 of 248].  In addition, PNC employees were monitoring the Court's docket in the Prior Case via the PACER System, which indicated a hearing was scheduled on the Amended HAMA Motion for January 13, 2016.

Davises had not obtained an order from this Court approving the Modification Agreement. Ms. Thomas testified that the Termination Letter simply confirmed that PNC had not received the Modification Agreement nor had court approval by the secret 60-day deadline been obtained and so PNC assumed that the Davises were no longer interested. PNC's own records indicate that the Davises informed PNC seven weeks earlier (on November 2, 2015) that they had returned the signed Modification Agreement. Any simple glance at the voluminous record of the telephone calls from Teresa Davis and her attempts at getting a modification over the preceding two years would have made it clear that it was unlikely the Davises would simply walk away once they finally received an offer from PNC. For PNC to suggest otherwise is simply not credible. If it made such an assumption, it did so without justification and in breach of its contractual obligations. The Court rejects this attempt, after the fact, to justify the false Termination Letter based upon a secret deadline.

### Recordation of the Modification Agreement

Unbeknownst to the Davises when they received the Termination Letter, the Modification Agreement had actually been recorded in the Land Records of Carroll County, Maryland a few days earlier on December 16, 2015. The Modification Agreement was submitted for recordation by Title First Agency[74] and shortly thereafter PNC received the recorded original Modification

---

[74] PNC admitted that Title First Agency recorded the Modification Agreement. In its response to one of the Plaintiffs' requests for admission, PNC stated: "PNC denies that Title First Agency acted as PNC's authorized agent *when it improperly recorded the invalid Loan Modification*." Defendant PNC Bank, N.A.'s Response and Objections to Plaintiffs' First Request for Admission of Fact and Genuineness of Documents [Plaintiffs' Exhibit 48, at p. 5.] (emphasis added). Moreover, the other evidence before the Court demonstrates that Title First Agency recorded the Modification Agreement. As drafted and presented to the Davises by PNC, the Modification Agreement contains a note to the clerk that states, "After Recording Return to: Title First Agency, National Operations, Attn: Post Closing, 2944 Fuller Ave. NE, Suite 200, Grand Rapids, MI 49505" [Defendant's Exhibit 17, at p. DX017-010]. In addition, paragraph 10 of the Land Instrument Intake Sheet submitted and recorded with the Modification Agreement indicates that the recorded document was to be "Return[ed] to Contact Person" and under "Instrument Submitted By or Contact Person" it identifies, "Tony, Title First Agency, 2944 Fuller Ave NE, Grand Rapids, MI 49505" [Plaintiffs' Exhibit 7, at Liber 8179, Page 232].

Agreement.[75]  PNC then transferred the recorded Modification Agreement to what Ms. Thomas referred to as "cold storage."[76]  The Modification Agreement as recorded contains hand written notations that were not made by the Davises and suggest that it was recorded by someone acting on behalf of PNC.  PNC did not notify the Davises that the Modification Agreement had been recorded or take any action to undo what they allege to the Court was now a "mistake."  The Davises only learned of the recordation well after the fact.  Incredibly, PNC undertook no investigation upon receipt of the recorded Modification Agreement to determine how it came to be recorded in the land records or who may have authorized such recordation on its behalf.

### Damages

PNC's breach of the Modification Agreement had adverse, real-world consequences for the Davises.  In their testimony, the Davises provided a compelling and credible account of the impact financial difficulties have on individuals and their families.  They are understandably frustrated and angry at PNC after their now more than seven-year ordeal in pursuit of a loan modification.  PNC did much to justify that frustration and anger.  In this adversary proceeding, however, the Court is not asked to address whether PNC could or should be held liable for all such conduct.  The question before the Court is what consequences PNC must face for injuries due to its breach of contract—that is, for injuries arising after and by reason of its wrongful Termination Letter sent to the Davises on December 22, 2015.[77]

---

[75]  The Servicing Notes contain an entry on January 6, 2016 that states: "MOD AGREEMENT REC'D BACK FROM COUNTY RECORDER."  SER Process Notes [Defendant's Exhibit 23, at p. DX023-016].  Based upon the evidence, the recorded Modification Agreement was returned to PNC not by the record office, but by Title First Agency.

[76]  In response to a question about her testimony that PNC did not receive the signed Modification Agreement from the Davises, she said "That is correct.  We did not get it back.  We got back the recorded mod in early 2016.  However, it was then sent to cold storage because at that point, because we did not have court approval, it was not a valid agreement."  Testimony of Dorothy Thomas, July 29, 2019 Transcript at p. 201, lines 13-16 [Docket No. 106, Page 201 of 248].  The Court notes that at the time PNC received the recorded Modification Agreement (as it did on its secret deadline date) that this Court had a pending hearing scheduled regarding such approval for January 13, 2016.

[77]  Based upon the evidence in the record, the Court is unable to determine when many of the events mentioned by the Davises occurred.  In many instances, the evidence indicates that the events took place before, not after, the date of

For starters, the Modification Agreement would have brought the Davises current on their mortgage and likely would have ended the Prior Case. Had that occurred, the Davises would be in a far different financial situation today. They could have moved on with their lives and would have been able to build back up their credit scores. There would have been no need for the current Chapter 13 case and the fees incurred in it by the Davises. PNC refused to accept monthly payments from the Davises, demanding instead payment in full under the Mortgage Statement.[78] PNC's refusal constituted a rejection of tender of monthly payments under the Modification Agreement. Beginning in January of 2018, the Davises began escrowing their monthly mortgage payments with their attorney.[79] As a result, years of interest has accrued on the principal balance of the loan and late charges and other fees have arisen that would not have occurred under the Modification Agreement.

The Davises also took time off from work to deal with PNC's actions and this litigation.[80] Christopher Davis took approximately 10 to 12 days off from work to deal with hearings and meetings related to this case.[81] As of December 27, 2013, his biweekly rate of pay was

---

the Termination Letter. For example, the Davises blame PNC for their marital difficulties and resulting separation, marriage counseling, and consultation with divorce attorneys. The testimony by the Davises on these points is credible. These difficulties certainly occurred before December 22, 2015 since they are described in the letter that the Davises submitted to PNC as part of the process that resulted in the Modification Agreement. Hardship Affidavit dated May 8, 2015 [Defendant's Exhibit 12], at p. DX012-004. It may be that these difficulties continued after or were made worse by the Termination Letter, but the Court cannot make that finding based upon this record. Accordingly, the Court limits its discussion of damages that follows to those injuries the record demonstrates occurred after the December 22, 2015 date of the Termination Letter.

[78] Testimony of Teresa Davis, July 29, 2019 Transcript, at p. 77, lines 21-24, [Docket No. 106, Page 77 of 248] ("They either wanted the full amount that was due or nothing.").

[79] *Id*., at p. 157, line 11 through p. 158, line 10 [Docket No. 106, Pages 157-58 of 248]. The Davises suggested that their tax difficulties stem in part from the fact that they were unable to take advantage of a deduction for mortgage interest on their tax returns for payments made in escrow with their attorney. According to the proof of claim filed by the Internal Revenue Service, the Davises apparently had tax difficulties long before they began to escrow monthly payments in 2018. Main Case Claims Docket, Claim No. 4-3 (asserting claims for unpaid taxes for years 2011, 2013, 2014, 2015, 2016, and 2017 that total in the aggregate $34,556.51, plus penalties of $1,584.41). No evidence was presented that would enable the Court to make a determination of the extent to which the Davises (i) paid more in taxes than they would have if the deduction would have been available, and (ii) were actually injured as a result.

[80] Although the Davises assert that PNC's actions negatively impacted their careers, no evidence was introduced that would show that their employers took any adverse personnel actions against either of them.

[81] Testimony of Cristopher Davis, July 29, 2019 Transcript, at p. 175, lines 17-23 [Docket No. 106, Page 175 of 248].

$1,828.08.[82]  That rate equals $182.80 per day, and it is consistent with (i) the most recent tax return that was introduced into evidence,[83] and (ii) Schedule I filed by the Davises in their Chapter 13 bankruptcy case on June 3, 2016 ("Schedule I"), which indicates a rate equivalent to $187.95 per day.[84]  The Court finds that Christopher Davis took 11 days off from work by reason of PNC's breach of the Modification Agreement, at a rate of $185.00 per day.  Accordingly, the Court finds that the value of his time off was $2,035.00.

Teresa Davis also took time off from work for the same reason, which she estimated amounted to 25 days over the course of the two Chapter 13 bankruptcy cases (not including three days for trial).[85]  As of January 10, 2014, her biweekly pay rate was $5,576.93.  That rate equals $557.69 per day, and it is also consistent with (i) the most recent tax return that was introduced into evidence, and (ii) Schedule I, which indicates a rate equivalent to $571.64 per day.[86]  The Court finds that Teresa Davis took 18 days off from work by reason of PNC's breach of the Modification Agreement, at a rate of $570.00 per day.  Accordingly, the Court finds that the value of her time off was $10,260.00.

In addition, the Court finds that an additional award of general damages is appropriate in this case.  PNC's breach of contract clearly caused other injuries to the Davises that are not susceptible to itemization or arithmetical calculation.  Mere determination of the number of days

---

[82] Frederick County earnings statement attached to Request for Mortgage Assistance dated January 21, 2014 [Plaintiff's Exhibit 30], at p. DAVIS00000094.

[83] Form 1040, U.S. Individual Income Tax Return for 2015 [Defendant's Exhibit 33, at p. DX033-001, line 7.  The Davises reported income of $190,595.00 for the year ending December 31, 2015.  The annualized total of the combined biweekly pay of the Davises as of January 1, 2014 was $192,530.26.

[84] Schedule I: Your Income [Main Case Docket No. 21, Page 20 of 44].  The monthly wages for Christopher Davis reported therein are $4,072.45—a rate that equals $187.95 per day.

[85] Testimony of Teresa Davis, July 29, 2019 Transcript, at p. 88, line 10 through p. 89, line 8 [Docket No. 106, Pages 88-89 of 248] ("there were times that either I just needed a mental health day or that I had to get the documentation back in time").  When asked to place a dollar figure on the value of her time, Teresa Davis responded that, "I would have to do the calculations, but probably $30,000 -- $25,000 to $30,000."  Her estimate on the witness stand was high, but it was of the right order of magnitude.  The Court finds that the calculation of a daily rate based upon the available evidence of her rate of pay is the appropriate measure.

[86] The monthly wages for Teresa Davis reported in Schedule I are $12,385.45—a rate that equals $571.64 per day.

a person was off work does not take into account the other time and inconvenience resulting from the disruption of the lives of the Davises and their family—for example, time spent at the kitchen table debating amongst themselves what action they should take or explaining the family's circumstance to their children. The Court finds that a material amount of such time and effort was expended as a result of and after PNC's Termination Letter, and that an appropriate such award in this case is $5,000.00.

For these reasons, the Court finds that breach of contract damages should be awarded to the Davises in the amount of $22,230.00, comprised of (a) $4,935.00 for filing and attorney's fees for their Chapter 13 case, (b) $12,295.00 for time off work, and (c) $5,000.00 for general damages.

### Emotional Distress Damages

PNC's actions also had serious emotional impact on the Davises. Christopher Davis was concerned that the stress of the impending trial in this adversary proceeding might impact his job performance and endanger both himself and coworkers so he removed himself from work one evening and took leave under the Family and Medical Leave Act ("FMLA").[87] Further, he was embarrassed that he had to explain these circumstances to his supervisor.[88]

PNC's actions also had a serious emotional impact on Teresa Davis. For example, Teresa Davis holds a high-level security clearance from the United States government in connection with her work. An ongoing Chapter 13 bankruptcy case triggers an annual review of her security clearance, requiring her to provide a financial disclosure and to undergo a background investigation and a polygraph examination. Ordinarily, such reviews only take place once every

---

[87] Testimony of Christopher Davis, July 29, 2019 Transcript, at p. 175, lines 1-16 [Docket No. 106, Page 175 of 248] ("I didn't know if we were going to lose our house ultimately at the end. And I guess – I wasn't in a good place mentally.").
[88] *Id.*, at lines 12-14 ("I told my boss that, you know, it was very embarrassing that I was having this trial come up and that I didn't know where it was going to leave us, leave our family.").

five years.  The commencement of the current Chapter 13 case has required such annual reviews and polygraph examinations for each of the past five years.[89]  These annual reviews are understandably stressful because they create fear and uncertainty about whether Teresa Davis will retain the security clearance necessary for her continued employment in the defense industry.

It is clear to the Court from their testimony taken as a whole (as well as from observation of their behavior on the witness stand) that the Davises experienced serious anxiety and emotional distress as a result of PNC's actions after December 22, 2015.  The Davises have been forced to live their lives for the past five years with the uncertainty of not knowing whether they will be able to continue to reside at the Property, a home that is emotionally important to both of them.  Based on the evidence, the Court finds that an award of damages of $50,000.00 for emotional distress is warranted and appropriate.[90]

## CONCLUSIONS OF LAW

This case comes down to two issues: a basic breach of contract claim and whether that breach was in turn a violation of the Maryland Consumer Debt Collection Act (the "MCDCA"),[91] as well as the Maryland Consumer Protection Act (the "MCPA").[92]  The  essence of the defense is that PNC had the right to revoke its offer and did so before the Davises satisfied the conditions for acceptance of that offer.  PNC contends that the conditions for acceptance included satisfaction

---

[89]  *Id.*, at p. 45, line 19 through p. 46, line 1 [Docket No. 106, Pages 45-46 of 248]; *Id.*, at p. 79, line 21 through p. 80, line 7 [Docket No. 106, Pages 79-80 of 248]; *Id.*, at p. 144, lines 5-21 [Docket No. 106, Page 144 of 248].

[90]  If the Court were to consider the emotional distress experienced by the Davises prior to December 22, 2015, the amount awarded would be substantially higher.  In the Court's view that distress is only relevant in this limited sense: the prior ordeal gave way to a feeling of relief upon receipt of the HAMA Letter that was then dashed a few weeks later by the Termination Letter, resulting in a profound emotional impact.

[91]  Md. Code Ann., Com. Law §§ 14-201, *et seq.*

[92]  Md. Code Ann., Com. Law §§ 13-101 *et seq.*

of not only the conditions stated in the HAMA Letter, but also those stated in the Modification Agreement.[93]

The Court disagrees. In the court's view, the HAMA Letter was an offer to provide a loan modification to the Davises on the terms of the Modification Agreement once the Davises satisfied the conditions stated in the Modification Agreement. The Davises accepted the offer made in the HAMA Letter. As a result, PNC was obligated to perform under that contract—that is, to modify the loan—once the Davises satisfied the conditions in the Modification Agreement. The only such condition at issue here was bankruptcy court approval, a condition that was satisfied by the Davises when the Court dismissed the Prior Case on March 11, 2016.

At that point, PNC was contractually obligated to modify the loan on the terms of the Modification Agreement. PNC has steadfastly refused to do so based on a supposed condition requiring court approval by December 22, 2015—a condition nowhere stated in any of the relevant documents. Of course, PNC could have specified that date in the Modification Agreement as a deadline for court approval. It did not do so. PNC cannot now ask this Court to rewrite the Modification Agreement to insert such a deadline after the fact.

## Count I - Breach of Contract

In Count I of their amended complaint (the "Amended Complaint"),[94] the Davises assert that PNC is liable for breach of contract. The Court agrees with their assertion.

An enforceable contract is formed under the general rule of Maryland law when "one party makes an offer and the other party accepts before the offer is revoked." *Fedder Dev. Corp. v. FB*

---

[93] The Court recognizes that PNC has made an alternative argument that the Modification Agreement was an offer made by the Davises that was never accepted by PNC. The evidence before the Court simply does not support that contention. The HAMA Letter specifies two steps for how the Davises were "to accept this offer." The Court has found that the Davises in fact completed both steps stated as conditions for acceptance. The Court sees no basis in fact or law for interpreting this language to mean the opposite of its plain meaning—namely, that PNC was and understood itself to be the party making an offer.
[94] Plaintiffs' First Amended Complaint, Docket No. 42.

*Hagerstown, LLC*, 181 Fed. Appx. 384, 390 (4th Cir. 2006) (citing *Prince George's County v. Silverman*, 472 A.2d 104 (Md. App. 1984)).  "An 'offer' is the 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Silverman,* 472 A.2d at 112 (quoting 1 Restatement Contracts (2d) § 24 (1979)).  Under Maryland law, a court looks to the written language of the contract to determine the intentions of the parties.  *Barr v. Flagstar Bank, FSB*, 303 F.Supp.3d 400, 412 (D. Md. 2018) (citing *Ford v. Antwerpen Motorcars Ltd.*, 443 Md. 470 (2015) (quoting *Curtis G. Testerman Co. v. Buck*, 340 Md. 569 (1995))).

PNC makes much of its argument that no contract was formed because it never signed the Modification Agreement.  In doing so, PNC fails to recognize that a contract was formed under the plain language chosen by PNC when the offer it made in the HAMA Letter was accepted by the Davises.  Thereafter PNC was obligated to modify the loan on the terms of the Modification Agreement once (as they eventually did here) the Davises satisfied all the conditions for PNC's performance.  Thus, PNC is obligated to complete the loan modification process by signing the Modification Agreement.  PNC's failure to do so was, and continues to be, a breach of its contractual obligations.

It has long been the law that "a signature is not required in order to bring a contract into existence, nor is a signature always necessary to the execution of a written contract."  *Porter v. Gen. Boiler Casing Co., Inc.*, 284 Md. 402, 410 (1979).  Indeed, many courts have held this to be true against banks in the case of loan modifications.  *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012) (discussing bank's position that language requiring the return by the bank of an executed loan modification agreement before the loan was modified turned 'an otherwise straightforward offer into an illusion' as it would allow the bank to refuse a loan modification for

any reason whatsoever after the borrower had already performed); *Adam v. Wells Fargo Bank, N.A.*, 901 F. Supp. 2d 623 (D. Md. 2012) (finding that a loan modification was binding when the borrower signed and returned it despite a blank signature line on the agreement for the bank); *Azimirad v. HSBC Mortg. Corp.*, 2011 U.S. Dist. LEXIS 40080, *10 (D. Md. April 12, 2011) (holding that when there is no explicit statement making the bank's signature a condition precedent, it is a question of intent of the parties to be determined by the court whether the bank's signature was simply "one step in the parties process of memorializing their existing agreement"); *but see Fedder Dev. Corp.*, 181 Fed. Appx. at 390 (4th Cir. 2006) (ruling that no binding contract was created because of a clause stating that "the contract is not binding on either party unless and until executed by and delivered to both parties.").

The exception to this rule is "when the terms of the contract make the parties' signatures a condition precedent to the formation of the contract." *Adam*, 901 F. Supp. 2d at 633 (citations omitted). Despite PNC's arguments, that exception is simply not applicable here. PNC argues that Section 2(B) of the Modification Agreement (the "PNC Signature Clause") satisfies this exception. The PNC Signature Clause is not a condition to contract formation, it is merely the final step in acknowledgement that the Davises satisfied the conditions in the Modification Agreement and the loan documents have been accordingly modified. This is made clear by the PNC Signature Clause itself, which states:

> I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that *the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements of this Agreement.*[95]

---

[95] Modification Agreement [Defendant's Exhibit 17 at p. DX017-005].

The first sentence speaks to the timing for modification of the loan; it is not a condition that nullifies the contract obligations under the HAMA Letter offer accepted by the Davises. More telling, the implication of the second sentence is that PNC is obligated to modify the loan if the reverse is true—that is, that PNC is obligated and bound to modify the loan documents if (as is the case here) the Davises met the requirements of the Modification Agreement.

Moving on from PNC's "signature" argument, when "ambiguity is found in a contract, it becomes a question of fact to decipher the intent of the parties." *Adam*, 901 F. Supp. at 634 (quoting *City of Bowie v. Mie Props. Inc.*, 398 Md. 657 (2007)). Once a court determines the contract is ambiguous, it may rely on extrinsic evidence to determine the parties' intent. *Beale v. Am Nat'l Lawyers Ins. Reciprocal*, 379 Md. 643, 658 (2004). "[W]here one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against that party." *Truck Ins. Exchange v. Marks Rentals, Inc.*, 288 Md. 428, 435 (1980) (citing *National Grange Mut. Ins. v. Pinkney*, 284 Md. 694, 705-706 (1979)). Although the Court does not find the various contract documents to be ambiguous, if the Court were to make that determination it would reach the same conclusion.

Much like with the rest of the attempts by the Davises to obtain a loan modification, PNC sent the Davises, their lawyer, and the Chapter 13 Trustee documents that might be viewed to be confusing and to contain conflicting and impossible terms. The HAMA Letter, however, is not such a document. It plainly identified itself as an offer. It congratulated the Davises and informed them they were "eligible for a Home Affordable Modification."[96] Immediately thereafter, the HAMA Letter states, "As previously described, if you comply with the terms of the [TPP] *we will modify your mortgage loan* and waive all prior late charges that remain unpaid."[97] What follows

---

[96] HAMA Letter [Defendant's Exhibit 17], at p. DX017-001.
[97] *Id.* (emphasis added).

are PNC's instructions on "**How to Accept This Offer**."[98]   The TPP Letter contained similar language assuring the Davises that their loan would be modified if they complied with the terms specified by PNC.[99]

The Modification Agreement continues with the "offer" language: "If my representations and covenants in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") *will … amend and supplement* (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."[100]  The Modification Agreement contains at least one term that both parties knew was an impossibility as of the time the Davises were directed to sign and return the agreement—namely that they had "obtained all necessary approvals for acceptance of this Modification required by the Bankruptcy Court and the trustee appointed to my bankruptcy case."[101]  The paragraph immediately below the PNC Signature Clause states, "If my representations and covenants in Section 1 [which includes the impossible Court Approval Clause] continue to be true in all material respects and all preconditions to the modification set forth in Section 2 [which includes the PNC Signature Clause] have been met, the Loan Documents will automatically become modified on 11/1/15 …."[102]  In sum, the Modification Agreement by its own terms became automatically effective on November 1, 2015 even though the Davises had until November 4, 2015 to return it to PNC (which would leave no time prior to the effective date for PNC to sign and return the Modification Agreement to the Davises).

---

[98] *Id*. (emphasis in original).
[99] *Id*. ("After all the trial period payments are made on time and you have submitted the required documents, and if you continue to qualify, *your mortgage will be permanently modified*.") (emphasis added).
[100] *Id*. (emphasis added).  The TPP Letter identified itself as the first step in the process.  It stated, "This is the first step toward qualifying for more affordable mortgage payments or more manageable terms." TPP Letter [Defendant's Exhibit 14], at p. DX014-003.
[101] *Id*. at p. DX017-005 (the "Court Approval Clause").
[102] *Id*.

The Court can only conclude that the PNC Signature Clause (i) was not a condition that somehow reversed the roles of PNC and the Davises as offeror and offeree, and (ii) did not negate the formation of a contract once the Davises accepted the offer made in the HAMA Letter.[103]  To the extent these are ambiguities, they must be resolved against PNC as the drafter of all the relevant contract documents.  To hold otherwise would render the agreement of the parties illusory.

Finally, these circumstances are far different from those considered by the Fourth Circuit in *Spaulding v. Wells Fargo Bank, N.A.*[104]  In that case, the bank responded to a borrower's request for a HAMP mortgage modification by requesting additional information.  No TPP was offered to the borrower.  When the borrower did not timely supply the requested information, the bank considered the request cancelled and proceeded with collection action.  As the Fourth Circuit said in *Spaulding*, the evidence was "clear that further action was required on the part of [the bank] before an offer would be extended.  When there is no offer, there can be no contract."[105]  Here, however, PNC offered both a TPP and a HAMP loan modification—each of which was accepted by the Davises.

Accordingly, the Court finds that the PNC Signature Clause was (i) intended by the parties to be a simple formality to memorialize the culmination of their already obligatory agreement, and (ii) was neither a condition precedent to the formation of a contract pursuant to the HAMA Letter nor a provision that gave PNC a unilateral right to terminate the Modification Agreement at a time when the Davises were undertaking compliance with the sole remaining condition for PNC's performance.  Thus, the contract was formed, and PNC has breached it.

---

[103]  At the time PNC purported to terminate the Modification Agreement, PNC itself recognized that the HAMA Letter contained an offer subject to acceptance by the Davises.  Termination Letter [Defendant's Exhibit 20] ("After being offered a Trial Period Plan or Home Affordable Modification you notified us on December 22, 2015 that you did not wish to accept *the offer*.") (emphasis added).
[104]  714 F.3d 769 (4th Cir. 2013).
[105]  *Id*. at 778.

## Count II – The Maryland Consumer Debt Collection Act

In Count II of the Amended Complaint, the Davises assert that PNC's conduct was also a violation of the MCDCA.  The Court agrees with their assertion.

The  MCDCA provides in relevant part that, "In collecting or attempting to collect an alleged debt, a collector may not … claim, attempt, or threaten to enforce a right with knowledge that the right does not exist."[106]  PNC is a "collector" within the meaning of the MCDCA.[107]  The statute provides that, "A collector who violates any provision of [the MCDCA] is liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury."[108]

The Davises argue that the various collection attempts by PNC after their Prior Case was dismissed on March 11, 2016 violated the MCDCA.  The Court agrees.  The rights of the Davises under the Modification Agreement were enforceable as of that date because all conditions were satisfied.  Thereafter, PNC sent the Davises (i) the Mortgage Statement demanding that they pay $51,372.48 by April 1, 2016,[109] and (ii) the Delinquency Letter requiring that they pay $41,975.03 to reinstate their loan and threating to conduct a foreclosure sale of the Property.[110]  PNC claimed these amounts based upon the original loan terms, not the terms of the Modification Agreement.

---

[106]  Md. Code Ann., Com. Law § 14-202(8).

[107]  *Id*. § 14-201(b) ("Collector means a person collecting or attempting to collect an alleged debt arising out of a consumer transaction.").  Under the MCDCA, "consumer transaction" means "any transaction involving a person seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes." *Id*. § 14-201(c).  Thus, the Modification Agreement and the underlying Note and Deed of Trust constituted a consumer transaction within the meaning of the MCDCA.  Each of the Davises and PNC is a "person" within the meaning of the MCDCA.  *Id*. § 14-201(d) ("'Person' includes an individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity.").

[108]  *Id*. § 14-203.

[109]  Mortgage Statement dated March 16, 2016 [Plaintiff's Exhibit 8].

[110]  Delinquency Letter dated March 16, 2016 [Plaintiff's Exhibit 9] ("Failure to bring your loan current may result in fees and foreclosure – the loss of your home.  As of the date of this letter, your loan is 746 days delinquent.  Your loan has been delinquent as of March 01, 2014.  If you are experiencing financial difficulty, see below information about mortgage counseling or assistance.  **First legal foreclosure action has been taken.**") (emphasis on original).

It then scheduled a foreclosure sale for April 25, 2016.  At the same time, PNC was refusing to accept any payment from the Davises that was less than the full amount PNC asserted was required to cure the alleged delinquencies.  These actions entirely ignored the rights of the Davises under the Modification Agreement.  Under it, no more than four monthly payments of $3,007.40 were then due.

Next, the Court must determine whether PNC took these collection actions with knowledge that its asserted right to collect the delinquency did not exist.  The meaning of "knowledge" under the MCDCA has been considered in several opinions issued by the United States District Court for the District of Maryland (the "District Court").  While the "knowledge" requirement of the MCDCA "does not immunize debt collectors from liability for mistakes of law," the MCDCA "is not a strict liability statute" like its federal counterpart, the Federal Fair Debt Collection Practices Act.  *Spencer v. Hendersen-Webb, Inc.*, 81 F.Supp.2d 582, 594-595 (D. Md. 1999).  "This has been held to mean that a party may not attempt to enforce a right with actual knowledge or with reckless disregard as to the falsity of the existence of the right."  *Kouabo v. Chevy Chase Bank, F.S.B.*, 336 F.Supp.2d 471, 475 (D. Md. 2004) (citing *Spencer*, 81 F.Supp.2d at 595).[111]

---

[111]  In an unreported opinion, the District Court further explained the ruling in *Spencer* as follows:

> In *Spencer*, the court observed that the construction of the "knowledge" requirement under the MCDCA was a matter of first impression.  Noting the remedial aim of the statute, the court in *Spencer* held that, with regard to mistakes of fact, knowledge can either mean actual knowledge or that the defendant acted with reckless disregard.  Explaining its holding, the court in *Spencer* stated: "This standard comports with the level of knowledge required for the similar common law actions of fraud … and defamation."  As the court in *Ellerin* noted, "reckless disregard … does not mean a situation where the defendant honestly, but negligently, believed that the representation was true."  *Ellerin v Fairfax Sav. Bank, F.S.B.,* 337 Md. 216, 234 (1995).

*Shah v. Collecto, Inc.*, 2005 WL 2216242, at *10; 2005 U.S. Dist. LEXIS 19938 at *32; (D. Md. Sept. 12, 2005) (citations omitted).  This is hardly such a case.  PNC did not honestly, but negligently, believe that it was entitled to collect the amounts demanded.  It sent the Davises the Termination Letter in which PNC falsely stated that the Davises did not wish to accept the Modification Agreement at time when (i) PNC knew the Davises were taking active steps to obtain court approval, and (ii) PNC's employees were simultaneously stating in its internal records that the termination was based upon a 60-day time limit never set forth in the Modification Agreement or any of the related correspondence PNC sent to the Davises.

The Court concludes that PNC acted either with the requisite knowledge or with the reckless disregard required under the MCDCA.  When it sent the Mortgage Statement and the Delinquency Letter to the Davises on March 16, 2016, PNC knew that (i) the Davises had accepted the offer made in the HAMA Letter, (ii) its reason for revoking the Modification Agreement stated in the Termination Letter was false, (iii) the Modification Agreement had been recorded by Title First and no effort had been made to remove it from the land records, (iv) the Prior Case had been dismissed thereby satisfying its secret December 21, 2015 deadline for bankruptcy court approval, and (v) under the terms of the Modification Agreement no more than four monthly payments of $3,007.40 were then due.  Nevertheless, PNC refused to acknowledge the rights of the Davises under the Modification Agreement.

Consequently, the Court must consider whether the record here demonstrates a basis for an award of emotional distress damages as allowed under the statute.  The Court concludes that the evidence is adequate for such an award.  In a case concerning the Fair Credit Reporting Act (the "FCRA"),[112] the Fourth Circuit said,

> Our previous cases establish the type of evidence required to support an award for emotional damages.  We have warned that "[n]ot only is emotional distress fraught with vagueness and speculation, it is easily susceptible to fictitious and trivial claims.  For this reason, although specifically recognizing that a plaintiff's testimony can provide sufficient evidence to support an emotional distress award, we have required a plaintiff to "reasonably and sufficiently explain the circumstances of [the] injury and not resort to mere conclusory statements."  Thus, we have distinguished between plaintiff testimony that amounts only to "conclusory statements" and plaintiff testimony that "sufficiently articulate[s]" true "demonstrable emotional distress."

*Sloane v. Equifax Info. Svcs., LLC*, 510 F.3d 495, 503 (4th Cir. 2007) (citations omitted) (changes in original).

---

[112] 15 U.S.C. § 1681, *et seq.*

The *Sloane* court outlined the following factors to be considered when determining whether an award of emotional distress damages is excessive:

> They include the factual context in which the emotional distress arose; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; the degree of such mental distress; mitigating circumstances, if any; physical injuries suffered due to the emotional distress; medical attention resulting from the emotional distress; psychiatric or psychological treatment; and the loss of income, if any.

*Id*. (citing *Knussman v. Maryland*, 272 F.3d 625, 640 (4th Cir. 2001)). After considering the evidence in *Sloane*, the Fourth Circuit held that the jury's award of $245,000.00 in emotional distress damages was excessive and reduced the award to $150,000.00.[113]

In applying the *Sloane* factors to this case, the Court is mindful that the Davises presented no evidence of physical injury, medical attention, or psychiatric or psychological treatment attributable to emotional distress arising from PNC's actions after December 21, 2015.[114] The evidence does show, however, the context in which the emotional distress arose and the nexus between PNC's actions and the emotional distress experienced by the Davises. Based upon that evidence, the Court found that real and serious emotional distress occurred. Suffice it to say that the Davises experienced a dramatic emotional shock at the time they received the Termination Letter—which letter falsely stated that the Davises had notified PNC that they were abandoning their long struggle to obtain a HAMP loan modification. And this emotional distress was not a one-time event. For example, Christopher Davis thereafter requested FMLA leave from work due

---

[113] In *Sloane*, the Fourth Circuit stated that its survey of emotional distress awards in FCRA cases "suggests that approved awards more typically range between $20,000 and $75,000." 510 F.3d at 505. The Court finds that range instructive for purposes of the determination that must be made here.

[114] The Termination Letter was itself an act to collect a debt in violation of MCDCA because it effectively asserted that the Davises were bound to pay PNC in accordance with the original loan terms rather than those of the Modification Agreement. PNC knew that its stated reason was false. PNC also knew that its actual reason was a supposed condition never disclosed to and therefore not binding on the Davises. For that reason, PNC's liability under the MCDCA arises as of the date of the Termination Letter.

to stress and Teresa Davis has been subjected to ongoing stressful annual background investigations and polygraph examinations.

After considering the *Sloane* factors and the evidence, the Court concludes that PNC is liable to the Davises for the emotional distress damages proximately caused by its actions. Accordingly, the Court will enter judgment under the MCDCA in favor of the Davises and against PNC in the amount of $50,000.00.

## Count III – The Maryland Consumer Protection Act

In Count III of the Amended Complaint, the Davises also assert a claim against PNC for violation of the MCPA. The Court agrees with this assertion.

The MCPA prohibits use by any person of "unfair and deceptive trade practices" in connection with, among other things, the "extension of consumer credit" or the "collection of consumer debts."[115] Each of the Davises is a "consumer" within the meaning of the MCPA.[116] PNC is a "person" within the meaning of the MCPA.[117]

An unfair or deceptive trade practice under the MCPA is expressly defined to include any violation of a provision of the MCDCA.[118] Thus, the District Court has held that "a violation of the MCDCA is a *per se* violation of the MCPA." *Hawkins v. Kilberg*, 165 F. Supp. 3d 386, 389 (D. Md. 2016). Since this Court has concluded that PNC violated the MCDCA, it therefore follows that PNC violated the MCPA.[119]

---

[115] Md. Code Ann., Com. Law §13-301.

[116] *Id.* § 13-101(c)(1) ("'Consumer' means an active or prospective purchaser, lessee, or recipient of consumer goods consumer services, consumer realty, or consumer credit."). Under the MCPA, "consumer credit" means credit that is "primarily for personal, family, household, or agricultural purposes." *Id.* § 13-101(d). Thus, the Modification Agreement constituted an extension of consumer credit within the meaning of MCPA.

[117] *Id.* § 13-101(h) ("'Person' includes an individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity."). PNC is also a "merchant" within the meaning of the MCPA. *Id.* § 13-101(g).

[118] *Id.* § 13-301(14)(iii).

[119] Under the MCPA, an unfair or deceptive trade practice is defined to include any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity,

A private party "may bring an action for injury or loss" sustained as a result of a violation of the MCPA.[120]  In such private enforcement actions, the Court of Appeals of Maryland has held that the MCPA "requires an aggrieved consumer to establish the nature of the actual injury or loss that he or she has allegedly sustained as a result of the prohibited practice."  *CitaraManis v. Hallowell*, 613 A.2d 964, 969 (Md. 1992).  Under the MCPA, "the injury must be objectively identifiable."  *Lloyd v. General Motors Corp.*, 916 A.2d 257, 277 (Md. 2007).  In the instant case, this Court has determined that the Davises are entitled to recover objectively identifiable and actual damages from PNC by reason of its violation of the MCDCA.  Thus, the Davises have established such damages under the MCPA as well.

In addition, the MCPA provides that "any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees."[121]  It is clear from the evidence before the Court that the Davises have incurred attorney's fees and expenses by reason of PNC's conduct in violation of the MCPA.  The Court concludes that this is a case in which an award of attorney's fees is justified.  The Davises may file a motion for attorney's fees in accordance with Rule 54(d)(2) of the Federal Rules of Civil Procedure (as made applicable here by Rule 7054(b)(2) of the Federal Rules of Bankruptcy Procedure).  PNC may file an opposition to such motion as provided in the Local Bankruptcy Rules.  As the Fourth Circuit held in the context of the FCRA, the provisions of Rule 54(d)(2) are "not discretionary."  *Sloan v. Equifax Information Services, LLC*, 510 F.3d at 507.  Accordingly,

---

tendency, or effect of deceiving or misleading consumers."  *Id.* § 13-301(1).  PNC's Termination Letter falls squarely within this definition—it contained a false statement and was predicated on a secret deadline that was never disclosed to the Davises.
[120]  *Id.* § 13-408(a).
[121]  *Id.* § 13-408(b).

the Court will enter a separate order establishing a briefing schedule on the question of the amount that should be awarded as reasonable attorney's fees.

## Count IV - Equitable Relief

In Count IV of the Amended Complaint, the Davises argue that this Court should grant them equitable relief against PNC in the form of (i) a determination that they were "seriously harmed, emotionally impacted, unreasonably inconvenienced, and victimized" by PNC's actions, (ii) an award of "sanctions … in an amount sufficient to bring the mortgage … current as of the date of this filing," (iii) an award of "sanctions … in an amount sufficient to cure all tax liability attributable to a lack of a mortgage interest deduction," and (iv) an award of "legal fees and expenses for being forced to bring and defend this adversary [proceeding]." The Davises repeated these requests in their post-trial brief. The Davises base their argument on § 105(a) of the Bankruptcy Code and on the well-known general principle that the bankruptcy court is a court of equity. For the most part, the Court is not convinced that equity affords the Davises any additional relief.

This Court is of course a court of equity and has the power to grant equitable relief when appropriate. The claims made in Count IV, however, merely duplicate in large part relief sought by the Davises under Counts I, II, and III of the Amended Complaint. For the reasons explained below, the Court will grant only limited equitable relief.

The Court has determined that the Modification Agreement was and is an offer made and accepted—that is, it is an enforceable contract that modified the terms of the Note and Deed of Trust. Accordingly, the Davises are entitled to cure any default and reinstate the mortgage loan on the terms of the Modification Agreement. Based upon the evidence presented and the record in this adversary proceeding and the Main Case, it is not possible to determine the amount that

must be paid to reinstate the mortgage loan.  Prior to entry of judgment, the Court will therefore order PNC to file an accounting of all amounts necessary to reinstate the loan under the terms of the Modification Agreement without penalties, late charges, attorney's fees or other collection costs incurred after December 22, 2015.  The Davises will be permitted to object to the accounting. If the parties are unable to agree, the Court will conduct such further limited evidentiary proceedings as are necessary solely for the purpose of determining that amount.

The Court has already determined that an award of damages, including damages for emotional distress under the MCDCA and attorney's fees under the MCPA, is appropriate in this case.  The Court sees no basis in equity to award other or further such damages or sanctions.

The Court has already determined that the evidence does not support an award of damages with respect to the claim that the Davises incurred tax liabilities or were otherwise injured by reason of an inability to take a mortgage interest deduction on their tax returns.  The Court sees no basis in equity to award sanctions with respect to that claim.

## <u>CONCLUSION</u>

For the above reasons, the court will enter an order that establishes a briefing schedule on the issues of attorney's fees and the loan reinstatement amount.  Following determination of these two amounts, the Court will enter judgment accordingly.


cc:    Christopher P. Davis
       Teresa Davis
       304 Saddleback Trail
       Mount Airy, MD 21771

       *Plaintiffs*

Mary Migues-Jordan, Esq.
Law Office of Mary A. Jordan
14 Crain Highway S.W.
Glen Burnie, MD 21061

Sari Karson Kurland, Esq.
The Kurland Law Group
211 Jersey Lane
Rockville, MD 20850

*Attorneys for the Plaintiffs*

Daniel J. Tobin, Esq.
Ballard Spahr LLP
300 East Lombard Street, 18th Floor
Baltimore, MD 21202

*Attorney for the Defendant*

**-- End of Memorandum Opinion --**