# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **PNC BANK, N.A.,** | * | |
| Appellant - Defendant, | | |
| v. | * | CIVIL NO. JKB-21-01367 |
| **TERESA DAVIS AND CHRISTOPHER DAVIS,** | * | |
| Appellees - Plaintiffs. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

This case comes before this Court on appeal from the United States Bankruptcy Court for the District of Maryland. The case arises from an adversary proceeding filed by debtors Teresa and Christopher Davis against PNC Bank, N.A. ("PNC") relating to the enforceability of a mortgage loan modification. PNC appeals the Bankruptcy Court's entry of final judgment in favor of the Davises. Because briefing has been bifurcated, the matter before the Court at this stage is only whether the Bankruptcy Court had the authority to enter final judgment in the adversary proceeding. (*See* ECF No. 7.) No hearing is required. *See* Local Rule 105.6 (D. Md. 2021).

PNC asserts that the adversary proceeding was a non-core proceeding and that PNC did not consent to the entry of final judgment by the Bankruptcy Court. The Davises contend that the proceeding was a core proceeding and that PNC consented to final judgment. The Court concludes that the Bankruptcy Court did not have the authority to enter final judgment in the adversary proceeding. Accordingly, the judgment of the Bankruptcy Court is VACATED and the parties are DIRECTED to present the factual record and legal issues for this Court's *de novo* review.

## I.     *Factual and Procedural Background*[1]

In short and as described in more detail below, the Davises have filed for bankruptcy twice and, during the second bankruptcy proceedings, they filed an adversary proceeding against PNC regarding the enforceability of a mortgage modification agreement. The Bankruptcy Court found that the adversary proceeding was a core proceeding and, thus, that it had authority to enter final judgment. The Bankruptcy Court found PNC liable for breach of contract and concluded that PNC had violated certain Maryland consumer protection statutes.

### A. *First Bankruptcy Case*

In 2005, the Davises obtained mortgage financing from PNC. (Bankr. Ct. Mem. Op. ("Bk. Op.") at 4–5, ECF No. 3-3.) In January 2014, PNC informed the Davises that it was initiating foreclosure proceedings. (*Id.* at 12.) On November 4, 2014, the Davises filed their first voluntary Chapter 13 bankruptcy case. (*Id.* at 7.) In October 2015, during the pendency of this first bankruptcy case, PNC offered the Davises a mortgage modification, which would reduce the amount of the Davises' monthly payments as compared to the original loan terms (the "Modification Agreement"). (*Id.* at 14.) In November 2015, the Davises filed motions in the bankruptcy proceeding seeking court approval of the Modification Agreement. (*Id.* at 17.) The bankruptcy trustee objected to the Modification Agreement. (*Id.*)

In December 2015, PNC sent the Davises a letter withdrawing the Modification Agreement because, per the letter, the Davises "notified [PNC] on December 22, 2015 that [they] did not wish to accept the offer." (*Id.* at 18.) Around the same time, the Modification Agreement was recorded in the Carroll County, Maryland land records. (*Id.* at 6.) As noted above, the Court will not detail

---

[1]     In synthesizing the facts of this matter, the Court relies on the parties' briefing, the Bankruptcy Court's Memorandum Opinion, and the Bankruptcy Court record. Further, because briefing has been bifurcated and the parties will separately brief the Court on the merits of this case, the Court will not focus here on the facts surrounding the enforceability of the mortgage modification agreement.

2

here the events surrounding the Davises' acceptance or non-acceptance of the Modification Agreement. However, suffice it to say that the parties disagree whether the Davises accepted the Modification Agreement such that it was enforceable.

The Davises eventually sought dismissal of the bankruptcy case prior to any hearing on (or approval of) the Modification Agreement, and the case was dismissed in March 2016. (*Id.* at 10.)

### B. Second Bankruptcy Case

After the dismissal of the first bankruptcy case, PNC sent the Davises mortgage billing statements requiring them to pay current and past due amounts on the mortgage. (*Id.* at 5.) PNC used the original loan terms to calculate these amounts. (*Id.*) Because the Davises did not pay the amount due, PNC scheduled a foreclosure sale for April 25, 2016. (*Id.* at 6.)

On April 22, 2016, the Davises filed a second voluntary Chapter 13 petition. (*Id.*) On August 26, 2016, 21st Mortgage Corporation filed a proof of claim, asserting that it held a claim in the amount of $596,473.91 secured by the Davises' home. (*Id.* at 7.) The proof of claim identifies PNC as the loan servicer and as the party who should receive notices and payments. (*Id.*)

The Davises filed their Chapter 13 plan (the "Plan") on September 27, 2016. (PNC Br. at 8, ECF No. 8.) It was confirmed by the Bankruptcy Court on October 8, 2016. (*Id.* at 9.) The Plan indicates that the secured claim held by PNC was "not affected by this plan and will be paid outside of the plan directly by the Debtor." (PNC Br. App. at PA0131, ECF No. 8-1.) The Plan also includes the following non-standard provision:

> PNC Mortgage – the debtors have applied to modify this first mortgage. BY CONSENT WITH THE CREDITOR, in the event the debtors are not actively in a modification with a scheduled trial payment within 180 days of this case being confirmed, unless other arrangements have been made with PNC Mortgage, a motion to modify the plan after

3

confirmation will be filed to include any arrears owed to PNC Mortgage, or this case will be converted or dismissed.

(*Id.*)

On January 25, 2017, PNC filed a Motion Seeking Relief from Stay, noting that "[a] Loan Modification Agreement was completed and executed by the parties herein. A copy of the loan modification is attached hereto as Exhibit D." (Bk. Op. at 6.) In response, the Davises described the events surrounding the Modification Agreement. (*Id.*) On January 9, 2018, PNC filed an amendment removing the Modification Agreement from the Motion Seeking Relief from Stay, noting that the Modification Agreement was invalid. (*Id.*) The Davises opposed this motion. (*Id.* at 6–7.)[2]

### *1. Adversary Complaint*

The Davises filed the instant adversary complaint against PNC on July 24, 2017. (PNC Br. at 9.) The Davises initially sought, *inter alia*, a declaratory judgment from the Bankruptcy Court that the Modification Agreement was operative and that the Davises were current on all payments at the time of the recordation of the Modification Agreement. (Compl. at 6–9, ECF No. 2-3.) However, in their May 2018 Amended Complaint, the Davises removed the claim for declaratory judgment on the enforceability of the Modification Agreement and included counts for breach of contract (seeking $50,000 in damages as well as costs and attorney's fees), violations of the Maryland Consumer Debt Collection Act ("MCDCA") (seeking $300,000 in damages as well as costs and attorney's fees), violations of the Maryland Consumer Protection Act ("MCPA") (seeking $300,000 in damages as well as costs and attorney's fees), and equitable relief, including

---

[2] The Court notes that on August 20, 2021, after the Bankruptcy Court issued its decision in the instant adversary proceeding, PNC filed an additional Motion Seeking Relief from Stay, which the Davises initially opposed. *In re* Davis, Bankr. No. DER-16-15555, ECF Nos. 159, 168. However, the Davises then consented to the motion, which the Bankruptcy Court granted on October 19, 2021. *In re* Davis, Bankr. No. DER-16-15555, ECF Nos. 173, 174.

4

sanctions in an amount to bring the Davises current on their mortgage payments and to cure related tax liabilities. (Am. Compl at 8–15, ECF No. 2-15.) In its Answer, PNC indicated under the heading "Statement in Compliance with Local Bankruptcy Rule 7012-1" that it "does not consent to the entry of final order[s] or judgments by the Bankruptcy Judge in this matter, in accordance with Federal Bankruptcy Rules 7008 and 7012(b)." (Answer at 12, ECF No. 2-16.)

### 2. *Bankruptcy Court Decision*

The Bankruptcy Court concluded that it had subject matter jurisdiction over the adversary proceeding, and that it was a "core proceeding" under 28 U.S.C. § 157(b). The Bankruptcy Court "considered and reject[ed] PNC's assertion that this adversary proceeding is not a statutory core proceeding under 28 U.S.C. § 157(b)." (Bk. Op. at 2, n.4.) The Bankruptcy Court explained that:

> The question of the enforceability of the mortgage modification agreement at issue here is one that must be resolved as part of the claims allowance process. Moreover, PNC asserted as much itself when it filed a motion in this Court asserting that the agreement was part of the loan documents evidencing its alleged secured claim. Thus, it is clear that the claims made against PNC are matters under § 157(b)(2)(B) concerning the "allowance and disallowance of claims" or under § 157(b)(2)(C) concerning "counterclaims by the estate against persons filing claims against the estate." To the extent that it is found that the Court lacks authority to enter its order herein as a final order, the court submits this memorandum opinion as proposed findings of fact and conclusions of law in accordance with 28 U.S.C. § 157(c)(1).

(*Id.*)

The Bankruptcy Court concluded that PNC was liable for breach of contract and that PNC violated the MCDCA and MCPA, and awarded the Davises $72,230 in damages (including $50,000 in emotional distress damages) and $302,472.67 in attorney's fees. (*Id.* at 25–38; Judgment, ECF No. 3-31.) While the Bankruptcy Court did not grant the sanctions sought by the Davises (i.e., sanctions in an amount to cure the default and tax liabilities), it determined that the Davises were entitled to cure any default and reinstate the mortgage loan on the terms of the Modification Agreement. (Bk. Op. at 38–39.)

5

## II. Legal Standard

A district court reviewing a decision of a bankruptcy court reviews questions of law *de novo*. *See In re Merry–Go–Round Enters.*, 400 F.3d 219, 224 (4th Cir. 2005). Whether a bankruptcy court had the authority to enter a final judgment in an adversary proceeding is a question of law, which this Court will review *de novo*. *See Okoro v. Wells Fargo Bank, N.A.*, 567 B.R. 267, 271 (D. Md. 2017).

## III. Analysis

PNC argues that the adversary proceeding was a non-core, but related, proceeding. (PNC Br. at 11–12.) PNC further argues that, even if the proceeding was statutorily core, it was not constitutionally core, and PNC did not consent to the entry of final judgment. (*Id.* at 12.) The thrust of the Davises' rejoinder is that the adversary proceeding was core because it "directly addressed what was due on PNC's filed proof of claim" and because PNC implicitly consented to the entry of final judgment by the Bankruptcy Court. (Davis Br. at 11–12, ECF No. 9.) The Court concludes that the Bankruptcy Court did not have the authority to enter final judgment with respect to the Davises' claims. Therefore, the Court will review both the findings of fact and conclusions of law by the Bankruptcy Court *de novo*.

### A. Bankruptcy Court's Authority to Enter Final Judgment

"[B]ankruptcy courts have the statutory authority to adjudicate and enter final judgments in 'core proceedings' under Title 11, 28 U.S.C. § 157(b)(1)." *MDC Innovations, LLC v. Hall*, 726 F. App'x 168, 170 (4th Cir. 2018). Core proceedings are those that "'arise under' Title 11 or 'arise in' Title 11 cases." *Id.* at 170–71 (citing *Stern v. Marshall*, 564 U.S. 462, 474–75 (2011)). A proceeding "arises under" Title 11 "if it is a cause of action created by the Bankruptcy Code, and which lacks existence outside the context of bankruptcy." *Educ. Credit Mgmt. Corp. v. Kirkland*,

6

600 F.3d 310, 316 (4th Cir. 2010) (quotations and alterations omitted). A proceeding "arises in" a Title 11 case when it is "not based on any right expressly created by Title 11, but nevertheless, would have no existence outside of the bankruptcy." *Valley Historic Ltd. P'ship v. Bank of New York*, 486 F.3d 831, 835 (4th Cir. 2007) (citations and quotations omitted). In other words, "a controversy arises in Title 11 when it would have no practical existence *but for* the bankruptcy." *Id.* (emphasis in original) (citations and quotations omitted). 28 U.S.C. § 157(b)(2) provides a non-exhaustive list of core proceedings, including "allowance or disallowance of claims against the estate" and "counterclaims by the estate against persons filing claims against the estate." 28 U.S.C. §§ 157(b)(2)(B), (C).

A "bankruptcy court may also hear a proceeding that is not a core proceeding, but is 'related to' a case under Title 11." *MDC Innovations*, 726 F. App'x at 171. These are considered "non-core" claims and, while a bankruptcy court may hear such claims, it may not enter final judgment, but rather must submit proposed findings of fact and conclusions of law to the district court. *Id.*

Even where a bankruptcy court has the statutory authority to enter final judgment, it must also have the constitutional authority to do so. *Id.* at 171–72 (citing *Stern*, 564 U.S. at 482–83). "Article III prevents bankruptcy courts from entering final judgment on claims that seek only to 'augment' the bankruptcy estate and would otherwise 'exis[t] without regard to any bankruptcy proceeding.'" *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 673 (2015) (quoting *Stern*, 564 U.S. at 499). To determine whether a bankruptcy court has such constitutional authority, "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 564 U.S. at 499. With respect to *Stern* claims—claims that are statutorily but not constitutionally core—a bankruptcy court may not enter final judgment. *Id.* at 469.

7

In cases involving either *Stern* or statutorily non-core claims, a bankruptcy court may still enter final judgment with consent of the parties. Such consent need not be express but must be "knowing and voluntary." *Wellness Int'l*, 575 U.S. at 684–85. "[T]he key inquiry is whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the non-Article III adjudicator." *Id.* at 685 (quotations omitted) (quoting *Roell v. Withrow*, 538 U.S. 580, 590 (2003)).

A practical effect of the core/non-core distinction is the standard of review applied by the district court on appeal. Where a bankruptcy court has issued a final judgment, either in a core proceeding or with the consent of the parties, the district court "review[s] the bankruptcy court's order under traditional appellate standards, reviewing factual findings for clear error and legal conclusions de novo." *MDC Innovations*, 726 F. App'x at 171. However, for statutorily non-core or *Stern* claims where the parties have not consented to the entry of final judgment by the bankruptcy court, the bankruptcy court "must submit proposed findings of fact and conclusions of law to the district court." *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34, 36 (2014). Such proposed findings of fact and conclusions of law are reviewed *de novo* by the district court. *Id.*

### *B. The Bankruptcy Court Did Not Have the Authority to Enter Final Judgment*

The Davises' claims—for breach of contract, violations of the MCDCA and MCPA, and equitable relief—are not statutorily core. Even if the Court considers these claims to be statutorily core, they are not constitutionally core. Therefore, absent consent of the parties, the Bankruptcy Court did not have the authority to enter final judgment on these claims.

The Davises argue that these claims are core because they relate to the "allowance or disallowance of claims against the estate" and are "counterclaims by the estate against persons filing claims against the estate." (Davis Br. at 14, 19 (citing 28 U.S.C. §§ 157(b)(2)(B), (C)).) The

8

Davises also note—without any elaboration—that the proceedings were core pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O). (*Id.* at 14, 23.) Although, as discussed above, 28 U.S.C. § 157(b)(2) provides a list of "core" proceedings, "a broad reading of the literal terms of the statutory text could lead to the result that courts treat just about every dispute as 'core.'" *In re Apex Exp. Corp.*, 190 F.3d 624, 631 (4th Cir. 1999). The Davises' claims do not "arise under" Title 11, as the causes of action are not "created by the Bankruptcy Code." *See Kirkland*, 600 F.3d at 316 (quotations omitted). These claims also do not "arise in" a Title 11 case, as the Davises' claims could have been brought whether or not the Davises filed for bankruptcy. *See MDC Innovations*, 726 F. App'x at 171 (citing *Valley Historic*, 486 F.3d at 835) (explaining that core claims are those that would have "no practical existence but for the bankruptcy"); *see also In re Lloyd E. Mitchell, Inc.*, Civ. No. AMD-07-1622, 2008 WL 11518428, at *8 (D. Md. Mar. 10, 2008) ("[T]he question of whether a claim 'arises under' title 11, 'arises in' a bankruptcy case, or is merely 'related to' a bankruptcy case is equivalent to the question of whether that claim is a 'core' proceeding or a 'non-core' proceeding within the meaning of 28 U.S.C. § 157.").

Further, the Davises fail to explain why an adversary proceeding seeking damages and equitable relief in the form of sanctions against a debtor whose secured debt has been excluded by a bankruptcy plan involves the "allowance or disallowance of claims against the estate." 28 U.S.C. § 157(b)(2)(B). This adversary proceeding did not arise in the context of the claims allowance process and, as discussed above, PNC's secured claim against the Davises was *expressly excluded* by the Plan. Of course, after PNC filed its proof of claim, the Davises could have sought declaratory judgment with respect to the enforceability of the Modification Agreement to modify the amount in PNC's proof of claim. This could have brought the question regarding the enforceability of the Modification Agreement within the ambit of a "core" proceeding. *See Moses*

9

*v. CashCall, Inc.*, 781 F.3d 63, 70 (4th Cir. 2015) (finding that a claim was core where the debtor sought to declare a loan unenforceable in the context of the claims allowance process, where the creditor filed a proof of claim and the debtor objected to the proof of claim, arguing that the loan was void). However, this is not such a case: the Davises did not object to PNC's proof of claim, expressly excluded the debt to PNC from the Plan, and are seeking monetary damages rather than a declaratory judgment relating to the enforceability of the Modification Agreement. Tellingly, the Bankruptcy Court did not address PNC's secured claim in its opinion; rather than award injunctive or declaratory relief that altered PNC's secured claim, the Bankruptcy Court awarded damages for breach of contract and violations of consumer protection laws and ordered that the Davises be allowed to cure their default.

Additionally, while the Davises' claims may arguably be statutorily core as "counterclaims by the estate against persons filing claims against the estate," 28 U.S.C. § 157(b)(2)(C), they are not constitutionally core. Indeed, under the heading "Article III Requires Adjudication of the Davises' Claims in Bankruptcy Court," the Davises argue only that PNC consented to the Bankruptcy Court's entry of final judgment. (Davis Br. at 20–23.) As noted above, in determining whether a claim is constitutionally core, "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 564 U.S. at 499; *see also CashCall*, 781 F.3d at 70–71 (finding that a claim for damages for violations of a state consumer protection statute was not constitutionally core because that claim would not "necessarily be resolved in the claims allowance process"). Further, the claims may not "seek only to augment the bankruptcy estate" or "otherwise exist without regard to any bankruptcy proceeding.'" *Wellness Int'l*, 575 U.S. at 673 (citations, quotations, and alterations omitted).

10

Here, the claims were not being resolved in the claims allowance process and also did not stem from the bankruptcy. As explained above, none of the Davises' claims were resolved in the context of the claims allowance process: PNC's claim was explicitly omitted from the Plan and the Davises were seeking damages under state law. The Davises could have filed suit elsewhere had they not been in the midst of bankruptcy proceedings. Further, the Davises did not seek a declaratory judgment regarding the enforceability of the Modification Agreement, but rather sought to augment the bankruptcy estate through claims for damages. As the Davises themselves state, "a counterclaim that seeks to reduce the amount that debtors owe to a claimant should be contrasted with the situation where a bankruptcy estate is seeking affirmative monetary relief from a claimant to augment the bankruptcy estate." (Davis Br. at 16.) The Davises' claims fall squarely into the latter category.

The Court therefore concludes that the Davises' claims were not statutorily or constitutionally core. Thus, absent consent of the parties, the Bankruptcy Court did not have the authority to enter final judgment.

### C. *PNC Did Not Consent to the Bankruptcy Court's Entry of Final Judgment*

A bankruptcy court may enter final judgment with consent of the parties with respect to non-core claims. The Davises argue that PNC implicitly consented to the entry of final judgment. (Davis Br. at 20–23.) PNC argues that it did not implicitly consent and that it in fact expressly did not consent. (PNC Br. at 21–22.) The Court finds that PNC did not consent to the Bankruptcy Court's entry of final judgment.

In *Wellness International*, the Supreme Court noted that "it is good practice for courts to seek express statements of consent or nonconsent, both to ensure irrefutability that any waiver of the right to Article III adjudication is knowing and voluntary and to limit subsequent litigation

11

over the consent issue." *Wellness Int'l*, 575 U.S. at 685 n.13; s*ee also In re Nozary*, Bankr. No. NVA-14-20664, 2017 WL 4411250, at *2 (Bankr. D. Md. Sept. 29, 2017) ("In the wake of *Stern*, this Court, as part of its pre-trial procedure, requests that all parties to an adversary proceeding indicate whether they consent to the entry of final judgment by this Court."). Following that practice, PNC clearly indicated its lack of consent in its Answer to the Davises' Amended Complaint. (Answer at 12 (noting that PNC "does not consent to the entry of final order or judgments by the Bankruptcy Judge in this matter").)

PNC's explicit objection renders this case unlike those where courts have found implied consent to enter final judgment. *See, e.g., Educ. Credit Mgmt. Corp. v. Pulley*, 532 B.R. 12, 23 (E.D. Va. 2015) ("[I]t is well-settled that a failure to object to a bankruptcy court's statutory authority to enter a final judgment provides implied consent to that bankruptcy court's statutory authority or waiver of that issue on appeal."); *In re Johnson*, 960 F.2d 396, 403–04 (4th Cir. 1992) (finding that defendants implicitly consented to the entry of final judgment where they did not object until after the bankruptcy court entered a dispositive order not in their favor).

The Court finds unpersuasive the Davises' arguments that PNC implicitly consented to the Bankruptcy Court's entry of final judgment despite PNC's explicit non-consent. Those arguments are that: (1) PNC entered into a post-petition contract (i.e., the Modification Agreement) with the Davises; (2) PNC attached the Modification Agreement to its Motion Seeking Relief from Stay; and (3) PNC filed a proof of claim. (Davis Br. at 20–23.) First, PNC did not enter a post-petition contract; the Modification Agreement was pre-petition, as it was purportedly entered into prior to the instant bankruptcy case.[3] Second, that PNC attached the Modification Agreement to its Motion

---

[3] The cases cited by the Davises are inapposite and involve significantly different facts regarding consent, and some relate to whether a proceeding is core, not whether there was consent. *See, e.g., In re Telemarketing Commc'ns*, 95 B.R. 794, 795 (Bankr. D. Colo. 1989) (explaining that the contract was "not only post-petition," but also "concerned all . . . of the assets of the Debtor," was "a contract other than in the ordinary course of business of the Debtor," was

12

Seeking Relief from Stay does not provide implicit consent for the Bankruptcy Court's entry of final judgment on claims for damages relating to breach of contract and violations of consumer protection statutes, and the Davises cite no authority for this proposition. Third, PNC's filing of a proof of claim at some point in the bankruptcy process also does not confer implicit consent. While the filing of such proof of claim may provide consent for the Bankruptcy Court's entry of final judgment as to that claim, it does not provide implicit consent for the entry of final judgment on any and all claims by the Davises against PNC. *See Mason v. Ivey*, 498 B.R. 540, 548 (M.D.N.C. 2013) (emphasis added) ("A proof of claim triggers the claims allowance process subject to resolution by the bankruptcy court. It has long been recognized that a creditor filing a proof of claim consents to entry of a final order *as to that claim*.").

### IV. Conclusion

Based on the foregoing, the Court concludes that the Bankruptcy Court did not have the authority to enter final judgment in the adversary proceeding. Accordingly, the determination that the dispute has "core" status will be reversed, the purported final judgment will be vacated, and the Bankruptcy Court's Memorandum Opinion will be construed as proposed findings of fact and conclusions of law. The parties will be directed to present the factual record and legal issues for this Court's *de novo* review.

DATED this 17 day of November, 2021.

BY THE COURT:

/s/ James K. Bredar

James K. Bredar
Chief Judge

---

a "cornerstone of a plan of reorganization," included an express provision that provided the bankruptcy court with jurisdiction, and was approved by the court); *In re Standard Metals Corp.*, 97 B.R. 593, 595 (Bankr. D. Colo. 1988) (explaining that the claim was *core* in part because the contract was entered into post-petition, "was executed as part of the debtor's bankruptcy and formed a focal point for generating a confirmed plan of reorganization").

13